**AMERICAN POSTAL WORKERS UNION, Plaintiff,**

v.

**UNITED STATES POSTAL SERVICE and William F. Bolger, Defendants.**

**Civ. A. No. 84–270.**

United States District Court,
District of Columbia.

Sept. 25, 1984.

Anton G. Hajjar, New York, Darryl Anderson, Washington, D.C., for plaintiff.

Mitchell Berger, Asst. U.S. Atty., Washington, D.C., for defendants.

## MEMORANDUM OPINION

JOHN GARRETT PENN, District Judge.

This is an action brought by the American Postal Workers Union, AFL–CIO (APWU)[1], to have declared unconstitutional and to enjoin the enforcement of certain United States Postal Service (USPS) "guidelines" which restrict the use of postal premises for voter registration and polling. APWU brings this action on its own behalf, on behalf of its members, and on behalf of postal employees represented by it. The matter is before the Court on cross-motions for summary judgment.

### I

Prior to this election year, locals affiliated with the APWU had, either with the permission or acquiescence of local postmasters[2], registered voters on postal premises[3]. Although by contract and regulation[4] APWU was not granted a right of access to postal premises for this purpose,

---

1. Plaintiff APWU is an unincorporated association of postal employees. It is the exclusive collective bargaining representative of over 300,000 postal workers. Complaint at ¶ 5.

2. *See, e.g.,* Declaration of Clarence E. Shepherd (Shepherd Decl.) at ¶ 2; Declaration of Roy Braunstein (Braunstein Decl.) at ¶ 3; Declaration of Roland L. Carter (Carter Decl.) at ¶ 4; and Declaration of Eleanor Bailey (Bailey Decl.) at ¶ 2.

3. The following list, found in Plaintiff's Statement of Material Facts (Plf. Mat. Facts) at ¶ 3, gives examples of the cities, the areas of the post offices, and the duration of prior voter registration drives conducted by APWU locals on postal premises:

| Local | Place | Year |
|---|---|---|
| Seattle | Swing rooms | 1982–1983 |
| Cleveland | Cafeteria | 1982 |
| San Francisco | Swing rooms | 1980–1982 |
| | Lobby | 1980–1982 |

| Local | Place | Year |
|---|---|---|
| N.Y. Metro | Lobby | 1973–1977 |
| | Swing rooms | 1977–1983 |
| Houston | Swing rooms & Cafeteria | 1980–1983 |
| San Jose, CA | Swing rooms | 1982 |
| Detroit | Swing rooms & Stewards' areas | 1982 |

*See also:* Carter Decl. at ¶¶ 3–5; Braunstein Decl. at ¶ 3; Bailey Decl. at ¶¶ 2–3; and Shepherd Decl. at ¶¶ 1–2.

4. *See* Articles 23 and 31 of the contract between the APWU and the USPS, and the Postal Service Employee & Labor Relations Manual § 661.52. These provisions indicate that APWU, as an institution, has been granted access to postal premises only for very limited and circumscribed purposes relating to union business. Voter registration is not such a purpose. For the weight to be given to these provisions *see* the Supreme Court's consideration of similar provisions in *Perry* 460 U.S. 37, at 40–51 and nn. 3,

the fact remains that APWU, through its affiliated locals, had been permitted to register voters on postal premises at certain locations for sometime [5].

In this election year APWU once again planned to register postal employees and the public on postal premises [6]. However, on December 1, 1983,[7] the USPS issued a set of "guidelines" [8] which, *inter alia*, prohibited all postal employees and "any organization which participate[s] or intervene[s] in [a] political campaign on behalf of [a] candidate" from registering voters on postal premises. *See* Postal Bulletin 21434, 12–1–83, at 9[9]. Since the issuance of the guidelines, local postmasters have prohibited APWU from registering voters on postal premises on the ground that the APWU "participate[s] or intervene[s] in [a] political campaign on behalf of [a] candidate" within the meaning of the guidelines [10].

On January 24, 1984, APWU filed this action challenging Sections (A)(1) and (A)(3) of the guidelines [11]. Plaintiff seeks a declaratory judgment that the aforementioned provisions violate the First Amendment to the United States Constitution, and seeks an injunction against their implementation and enforcement. The Court will examine each of these provisions in turn.

## II

### 1. *Section (A)(1)*

Section (A)(1) provides that a postmaster may approve voter registration requests only if the registration is

conducted by government agencies or nonprofit civic leagues or organizations that operate for the promotion of social welfare but do not participate or intervene in any political campaign on behalf of any candidate for any public office.

Postal Bulletin 21434, 12–1–83, at 9. As noted above [12], USPS, through its local postmasters, has denied APWU and its affiliated locals access to postal premises for the purpose of registering voters, on the grounds that APWU is an organization that "participate[s] or intervene[s] in [a] political campaign on behalf of [a] candidate for [a] public office" [13]. APWU challenges this provision both as written and as applied to them [14, 15].

---

11, 103 S.Ct. 948, at 952–958 and nn. 3, 11, 74 L.Ed.2d 794.

**5.** *See supra* note 3.

**6.** *See, e.g.,* Plf. Mat. Facts at ¶¶ 4, 28, 32, 33; Carter Decl. at ¶¶ 6–7; Braunstein Decl. at ¶ 3; Shepherd Decl. at ¶ 4.

**7.** These guidelines were allegedly promulgated in response (and in opposition) to legislative activity in Congress. *See* Defendants' Statement of Material Facts (Defts. Mat. Facts) at ¶¶ 1–2; and Letter from W. Allen Sanders to Chairman Ford, Exhibit 1, Defts. Mat. Facts.

**8.** A copy of the guidelines is provided at Appendix A.

**9.** Defendants state that the guidelines (or regulations) were promulgated under the general rulemaking grant of 39 U.S.C. § 401. *See* Memorandum of Points and Authorities in Support of Defendants' Motion for Summary Judgment (Defts. Mem.) at 20; and Defendants' Memorandum in Opposition to Plaintiff's Cross-Motion for Summary Judgment (Defts. Opp.) at 7. Although the provisions are entitled "guidelines", it is evident from their application and from the government's papers (note description of provisions as "regulations" throughout Defts. Mat. Facts) that these guidelines have the force and effect of USPS regulations. *See also* Defts. Mem. at 9.

**10.** *See* Plf. Mat. Facts at ¶¶ 6–8, 11; *see also* Bailey Decl. at ¶ 4; Shepherd Decl. at ¶ 8; Braunstein Decl. at ¶ 3; Declaration of Ronald Miera (Miera Decl.) at ¶ 5.

**11.** Plaintiff originally challenged the application of Section (B)(8) as well, but the Court has been informed by plaintiff that its dispute with USPS over this provision has been resolved.

**12.** *See supra* note 10 and accompanying text.

**13.** For the basis of this conclusion, *see infra* p. 1360.

**14.** While APWU has not phrased its challenge in precisely this way (i.e. "both as written and as applied") this is how its arguments break down.

**15.** The government asserts that APWU lacks standing to raise this issue since APWU will not admit that it has endorsed a candidate for president of the United States. Defts. Mem. at 13. The government's argument is that if APWU has not endorsed a candidate for president, it is not subject to the restriction contained in (A)(1); and if it is not subject to (A)(1)'s restriction it

### a. *Section (A)(1) as written*

The case which controls the Court's review of Section (A)(1) is *Perry Education Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983); *see also NAACP v. Devine*, 727 F.2d 1247 (D.C.Cir.1984), and *Ysleta Fed. of Teachers v. Ysleta Independent School District*, 720 F.2d 1429 (5th Cir.1983). Under *Perry*, a court's first task is to determine whether the "property" in question is a "traditional public forum", "limited public forum", or "private forum"[16], for "[t]he existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue". *Perry* 460 U.S. at 44, 103 S.Ct. at 954.

■ "Traditional public forums" are "places which by long tradition or by government fiat have been devoted to assembly and debate". *Id.* at 45, 103 S.Ct. at 954. The most often cited examples are "streets and parks which 'have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions'". *Id.* (citation omitted). No evidence has been submitted which would support a conclusion that post offices are traditional public forums[17].

■ The second category of public property, "limited public forums", consists of "public property which the State has opened for use by the public as a place for expressive activity". *Id.* This is property which was not initially created or designated as a public forum but which has, in essence, been transformed into a public forum because the State has opened it to the public as a place for expressive activity. *Id.* at 45–47, 103 S.Ct. at 954–956. As is discussed more fully below, the State need not open the facility to the public at large or for all expressive activity for the conversion to a limited public forum to occur. Although *Perry* suggests that this is the clearest case of a limited public forum, "selective access", either in terms of the activity permitted, or the groups admitted, may at times suffice[18]. The government need not retain the "open" character of the facility indefinitely just because it has at some time opened it to the public. *Id.* at 46, 103 S.Ct. at 955.[19] However, as long as the facility does remain open to the public for expressive activity, the standards applicable to public forums apply. *Id.*[20]

Both the facts and language of *Perry* make it clear that a limited public forum is not easily created. As noted above, there are two principal ways that a limited public forum may result. One way is where there is "indiscriminate use by the general public [for the desired activity]", where "permission [is] granted as a matter of course to all who seek [access for the purpose at issue]". *Id.* at 47, 103 S.Ct. at 956. This does not describe the instant case[21]. A second way is through "selective access". This is where access to the facility is not granted to the public at large, but to select groups or for select expressive purposes.

---

has not suffered injury-in-fact sufficient to confer standing. *Id.* The Court rejects this argument. As noted above, *see supra* note 10 and accompanying text, APWU has been denied permission by USPS officials to register voters on postal premises on the ground that APWU is a prohibited organization under (A)(1). The denial on this basis is sufficient to confer standing.

**16.** "Private forums" are also known as "nonpublic forums", *see Perry* 460 U.S. at 49, 103 S.Ct. at 957, and "public property that is neither a traditional nor a limited public forum", *see NAACP v. Devine, supra,* 727 F.2d at 1257.

**17.** The fact that the public has continuous access to post offices for postal business does not make the property a public forum. *See, e.g.,*

*U.S. Postal Service v. Greenburgh Civic Assns.,* 453 U.S. 114, 101 S.Ct. 2676, 69 L.Ed.2d 517 (1981) (mailboxes not public forums).

**18.** *See infra* p. 1357, and *Perry* at n. 7.

**19.** As the facts of *Perry* illustrate, the government may even close the facility, within certain bounds, to groups formerly granted access. *See infra* pp. 1356–1357.

**20.** The right of access is slightly different where a limited public forum is created by "selective access" rather than by indiscriminate public access. *See infra* p. 1357, and *Perry* 460 U.S. at 48, 103 S.Ct. at 956.

**21.** *See supra* note 4 and accompanying text.

*See Perry* at 46–48 and n. 7, 103 S.Ct. at 955–56 and n. 7. *Perry* indicates, however, that selective access, in and of itself, will not necessarily (and not often) suffice [22]. In *Perry* a union sought access to a school mail system. The Supreme Court held that periodic use of the mail system by private non-school-connected groups was insufficient to create a limited public forum, *id.* at 47, 103 S.Ct. at 956; that regular access by other organizations, including another union, would not suffice, *id.;* and that prior access by the plaintiff was not enough. *Id.* at 48, 103 S.Ct. at 956. Moreover, even when selective access does create a limited public forum, the constitutional right of access extends only to other entities of similar character. *Id.*

■ It cannot be gainsaid that USPS permits selective access to its premises for the purpose of registering voters. Access for this purpose is granted to "government agencies or nonprofit civic leagues or organizations that operate for the promotion of social welfare but do not participate or intervene in any political campaign on behalf of any candidate for any public office". Section (A)(1). Yet it is the Court's opinion that "[t]his type of selective access does not transform [the] government property into a public forum" anymore than it did in *Perry. Id.* at 47, 103 S.Ct. at 956.

More importantly, even if the selective access in this case has converted postal premises into limited public forums, they are limited public forums only for entities similar to those being granted access [23]. APWU is not a "government agenc[y] or nonprofit civil leagu[e] or organizatio[n] that operate[s] for the promotion of social welfare". Section (A)(1). Nor is APWU an organization that does "not participate or intervene in any political campaign on behalf of any candidate for any political office". *Id.*[24] Accordingly, APWU's right of access to postal premises, if any, is not governed by the standards applicable to a limited public forum.

■ What remains is the conclusion that postal premises are, for purposes of First Amendment-access regulation analysis, "nonpublic" or "private" forums. Regulations governing access to this type of forum are scrutinized under different standards than regulations governing access to public forums. In addition to time, place, and manner regulations, the government may reserve the property for its intended purposes, communicative or otherwise, "as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view". *Id.* at 46, 103 S.Ct. at 955. The government retains

> the right to make distinctions in access on the basis of subject matter and speaker identity. These distinctions may be impermissible in a public forum but are inherent and inescapable in the process of limiting a nonpublic forum to activities compatible with the intended purpose of the property. The touchstone for evaluating these distinctions is whether they are reasonable in light of the purpose which the forum at issue serves.

*Id.* at 49, 103 S.Ct. at 957. The crux of the standard is that "[t]he ... policy need only rationally further a legitimate state purpose". *Id.* at 54, 103 S.Ct. at 959. In addition, in determining the reasonableness of this type of regulation, a court may consider whether there are "substantial alternative channels that remain open" for communication. *Id.* at 53, 103 S.Ct. at 959.

**22.** *See also Greer v. Spock,* 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976), and *Lehman v. City of Shaker Heights,* 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974).

**23.** *See* discussion *supra.*

**24.** For the reasons that APWU has been deemed to "participate or intervene in [a] political campaign on behalf of [a] candidate for ... public office", *see infra* p. 1360. The fact that APWU "participates ... in a political campaign", is a

postal workers' union, and is primarily seeking to register fellow postal employees and union members, significantly distinguishes it from the organizations which are granted access under (A)(1). The risk of coercion is much greater in the case of APWU—a partisan organization with close connections to the primary group it seeks to register—than it is in the case of the other groups which are nonpartisan and not connected to the postal workers. *See* discussion of the potential for coercion *infra* p. 1362.

Guided by these standards, the Court will proceed to analyze the validity of Section (A)(1).

USPS justifies its access policy on the following grounds. As a general matter, applicable to all the guidelines, USPS believes that non-postal activity should not be permitted where it could lead to the perception or appearance that the Postal Service is involved in the political process or is biased in the performance of its mission. Affidavit of William B. Thomas (Thomas Aff.) at ¶ 6. It is crucial that the public trust the Postal Service to deliver all communications and to perform other services without bias or favoritism. *Id.* at ¶ 12. The restriction in Section (A)(1) is designed to prevent the appearance or public perception that the Postal Service has endorsed or approved a candidate and is not impartial. *Id.* at ¶ 14.

Avoidance of the appearance that the government is partisan or biased has repeatedly been held by the Supreme Court to be a legitimate and important governmental objective. *See, e.g., U.S. v. Grace,* 461 U.S. 171, 103 S.Ct. 1702, 1710, 75 L.Ed.2d 736 (1983) ("we do not discount the importance of this proffered purpose [that it should not appear to the public that the Supreme Court is subject to outside influence]"). In *U.S. Civil Service Commission v. National Association of Letter Carriers,* 413 U.S. 548, 565, 93 S.Ct. 2880, 2890, 37 L.Ed.2d 796 (1973), the Court held

> it is not only important that the Government and its employees in fact avoid practicing political justice, but it is also critical that they appear to the public to be avoiding it, if confidence in the system of representative Government is not to be eroded to a disastrous extent.

*See also Greer v. Spock,* 424 U.S. 828, 839, 96 S.Ct. 1211, 1218, 47 L.Ed.2d 505 (1976) (approving the goal of insulating the military from "both the reality and the appearance of acting as a handmaiden for partisan political causes or candidates").

Not only is the proffered justification a legitimate goal in the abstract, it is legitimate in this case "in light of the purpose which the forum at issue serves". *Perry* 460 U.S. at 49, 103 S.Ct. at 957. The Postal Service is perhaps the most pervasive of all government agencies. Its independence from the political process and freedom from the appearance of being involved in the political process is critical to its effective operation. *See* Thomas Aff. at ¶¶ 5–13; *see also Letter Carriers, supra,* 413 U.S. at 565, 93 S.Ct. at 2890 (passages referring to the necessity of preserving "confidence in the system" and "reduc[ing] the hazards to fair and effective government"), *Greer v. Spock, supra,* 424 U.S. at 839, 96 S.Ct. at 1218, and *U.S. Postal Service v. Greenburgh Civic Assns.,* 453 U.S. 114, 133, 101 S.Ct. 2676, 2687, 69 L.Ed.2d 517 (1981) [25].

One might ask if there is not a less restrictive method of achieving the same goal, e.g., requiring the union to clearly disclaim any connection with or support from the Postal Service, or requiring that the activity be conducted in a strictly nonpartisan manner. Aside from the question of the effectiveness of such alternatives, there are two answers to the question. The first is that, as a nonpublic forum, the government is not required to employ the least restrictive alternative. The opinion in *Perry* was utterly devoid of any such analysis. The second answer is that it is this Court's considered opinion that the United States Postal Service may legitimately restrict access to its premises, for the purpose of registering voters, to *clearly* nonpartisan organizations. USPS need not adopt regulations which would inevitably entail significant hair-splitting, gray areas, and substantial policing; it need not embroil itself in the problems of making sure that an otherwise partisan organization will conduct its voter registration—a recognized tool of partisan campaigns [26]—in a strictly nonpartisan manner [27].

---

**25.** Nor has plaintiff presented any evidence that USPS "intended to discourage one viewpoint and advance another". *Perry* 460 U.S. at 49, 103 S.Ct. at 957. Section (A)(1) is viewpoint neutral.

**26.** It is clear that APWU recognizes the value of voter registration in partisan campaigns: *see* Defendants' Supplemental Statement of Material Facts (Defts. Suppl. Mat. Facts) at ¶¶ 48, 53; and Plaintiff's Reply Memorandum (Plf. Reply)

**27.** See note 27 on page 1359.

The Court's conclusion that Section (A)(1) is reasonable is buttressed by the fact that substantial alternative avenues for registering voters remain open to the APWU or any other restricted organization[28]. APWU may enlist the services of a non-restricted organization to register voters on premises[29]; the union may urge its members to register through its publications[30]; and it may register employees and the public off postal premises, e.g., at union meeting places, malls[31], or outside public libraries[32, 33].

In this case plaintiff is demanding the right to register voters "whenever and however and wherever they please". *Greer v. Spock, supra,* 424 U.S. at 836, 96 S.Ct. at 1216, quoting *Adderly v. Florida,* 385 U.S. 39, 48, 87 S.Ct. 242, 247, 17 L.Ed.2d 149 (1966); *U.S. Postal Service v. Greenburgh Civic Assns., supra,* 453 U.S. at 133, 101 S.Ct. at 2687. Plaintiff does not have this right. *Id.* Substantial alterna-

tive avenues for registering voters exist and Section (A)(1) is more than rational. Section (A)(1) is constitutional, under the First Amendment, as written.

### b. *Section (A)(1) as applied*

Plaintiff also argues that Section (A)(1)'s prohibition is unconstitutional as applied to it. Plaintiff asserts that (a) it does not "participate or intervene in any political campaign on behalf of any candidate for any public office"; (b) even assuming that it has endorsed a candidate or otherwise participated in the campaign, that does not mean that its individual union members identify themselves with the organization's partisan goals; and (c) just because the union may be partisan does not mean that it cannot register voters in a nonpartisan fashion. *See* Plf. Mem. at 13–15.

With regard to the first argument, the government has submitted more than ample evidence to support the conclusion that APWU does "participate" in this elec-

---

at 8. *See also* lead story in the Sunday, September 16, 1984 *Washington Post* which stated that voter registration "was expected to be the most powerful weapon in the Democratic arsenal" this campaign. *Washington Post,* September 16, 1984, at A1, col. 1.

27. For an analysis of the question of whether a partisan organization is capable of engaging in political activity in a nonpartisan manner, *see American Federation of Government Employees v. O'Connor,* 589 F.Supp. 1551, 1553 (D.D.C. 1984).

28. *See Perry* 460 U.S. at 53, 103 S.Ct. at 959 for the significance of alternative avenues of communication in First Amendment-access regulation analysis. *See also Greer v. Spock, supra,* 424 U.S. at 839, 96 S.Ct. at 1218, and *Pell v. Procunier,* 417 U.S. 817, 827–28, 94 S.Ct. 2800, 2806–07, 41 L.Ed.2d 495 (1974).

29. *See* Defts. Mem. at n. 6.

30. The effectiveness of the APWU publications as a means of communication is borne out by the fact that the APWU conducted a membership presidential preference poll through the use of a pre-paid returnable postcard enclosed in the September issue of the *American Postal Worker* magazine, which drew enough responses to enable APWU to cast 248,972 votes at the AFL–CIO convention. *See APWU News Service,* Vol. XIII, No. 27, 10–5–83, at 1. APWU is also

soliciting political contributions from its membership through its magazine.

31. Indeed, the Cleveland local of the APWU had planned to register voters at malls as well as at postal facilities. *See* Plf. Mat. Facts at ¶ 28.

32. The fact that these methods may not be as efficient or convenient as the methods desired by plaintiff is not dispositive. The First Amendment does not require that the most efficient avenue of communication be available. *See, e.g., U.S. Postal Service v. Greenburgh Civic Assns., supra,* 453 U.S. at 129, 101 S.Ct. at 2685. Moreover, the Court has trouble with plaintiff's assertion that alternative avenues do not exist when plaintiff's own papers have stated that "attempts to register voters on public property ... were bound to fail, *and have not even been tried".* Brief in Support of Plaintiff's Motion for Reconsideration of this Court's Denial of the Temporary Restraining Order at 4 (emphasis added).

33. Plaintiff's suggestion that postal employees are denied the right to be registered is frivolous. Employees may register themselves in the same way any other citizen registers to vote. With respect to this argument, the Supreme Court's statement in *Greer v. Spock* is instructive: "members ... are wholly free as individuals to attend political rallies, out of uniform and off base". 424 U.S. at 839, 96 S.Ct. at 1218.

tion on behalf of the Democratic presidential candidate. *See* Defts. Suppl. Mat. Facts at ¶¶ 47–54 (referring to statements in APWU publication). Statements in the APWU publication, *The American Postal Worker*, indicate that it is a highly politicized organization with the partisan goal of electing a pro-labor Democratic president of the United States. *See id.* The publications demonstrate that voter registration is viewed by APWU as a key method of achieving this goal. *Id.* at ¶¶ 48, 53, and 54.[34] APWU is "affiliated" with the AFL–CIO, which unequivocally endorsed Mr. Mondale as the Democratic nominee, and the APWU participated in the AFL–CIO nominating convention to the extent of casting votes for Messrs. Mondale and Glenn. *See* Plf.Mem. at 2. For APWU to assert that they are not participating in this election on behalf of a candidate is to ignore the plain meaning of the word "participate" and to construe too narrowly the words "on behalf of". APWU has urged its members, through union literature, to undertake activities in support of the labor endorsed Democratic candidate. Defts. Suppl. Mat. Facts at ¶¶ 46–54.

The Court rejects plaintiff's other two arguments as well. As for the second argument, (A)(1) is only addressed to organizations as a whole; as an organization, the evidence supports the conclusion that APWU is participating in this election in a partisan manner. With regard to the third argument, again (A)(1) does not focus on the particular activity, but rather on the character of the organization. For the reasons discussed above[35], the Court finds

**34.** *See also, supra* note 26.

**35.** *See supra* notes 26–27 and accompanying text.

**36.** *Id.* Moreover, the evidence presented on the manner used to register employees in New York suggests that at least in some locations the registration has not been conducted in a completely neutral fashion. In New York, the registration forms used by the APWU included a space for marking party affiliation, and the forms were returnable to the union instead of to a local Board of Election. *See* discussion *infra* p. 1361; *see also* Bailey Decl. at ¶¶ 39, 41.

this method of regulation constitutionally permissible in this case[36].

The application of Section (A)(1) to prohibit the APWU from registering voters on postal premises is lawful.

### 2. *Section (A)(3)*

Section (A)(3) provides that

[p]ostal employees must not participate in any voter registration activity conducted on Postal Service premises.

Postal Bulletin 21434, 12–1–83, at 9. The first step in the Court's analysis is to flush out exactly what the regulation does and does not prohibit. Section (A)(3) prohibits *all* postal employees from conducting any kind of voter registration[37], *regardless of whether the activity is partisan or nonpartisan,* on postal premises *only*. The regulation does not prevent postal employees from registering voters *off premises*, nor from urging their co-workers to vote, to register to vote, to vote a certain way, or to register with a particular party, *on postal premises.* Defts. Mem. at 4–5.

Thus, Section (A)(3) does not restrict the *expression* contained in the activity of registering voters on postal premises; it only restricts the activity. Off postal premises, Section (A)(3) restricts neither the activity nor the expression. Properly viewed, the regulation is in fact a very limited one in the context of the First Amendment. Its restrictions on expression, debate, and the interchange of ideas—the core values which the First Amendment seeks to protect[38]—are realistically quite minimal if not nonexistent. Accordingly, at the outset

**37.** The intent of this provision is to prohibit organizations which qualify under (A)(1) from employing the services of USPS employees to register voters on postal premises. Deft. Mem. at 2. Defendants' pleadings indicate, however, that (A)(3) prohibits an employee from registering voters on postal premises even if done on the employee's own initiative. Defts. Mem. at 5.

**38.** These were also some of the values which the Supreme Court identified and sought to protect in the *Pickering* and *Connick* decisions. *See Pickering v. Board of Education,* 391 U.S. 563, 571–73, 88 S.Ct. at 1736–37 (1968); *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 1687, 75 L.Ed.2d 708 (1983).

this Court would question whether the First Amendment is even implicated here.

Assuming for the purposes of discussion that the First Amendment is implicated, the next step in the Court's analysis is to determine the appropriate standard of review. Plaintiff argues that the standards enunciated in *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) govern. The government disagrees[39], arguing that *Pickering* dealt with speech-expression only, and therefore must be restricted to cases involving the regulation of speech-expression, as opposed to conduct. While the government is correct that *Pickering* was primarily concerned with a restriction on speech, and that the holding of the case was couched in terms of speech[40], the Supreme Court appears to have extended the holding of *Pickering* to cover conduct too. In *Letter Carriers, supra*, 413 U.S. at 564, 93 S.Ct. at 2889, the Court stated

> [a]s the Court held in *Pickering v. Board of Education*, 391 U.S. 563, 568 [88 S.Ct. 1731, 1734, 20 L.Ed.2d 811] (1968), the government has an interest in regulating the *conduct* and the "speech of its employees that differ[s] significantly from those it possesses in connection with regulation of the speech of the citizenry in general". (emphasis added).

Although this Court has other reservations about the applicability of *Pickering* to Sec-

tion (A)(3)[41], the case cannot be distinguished for the reason suggested by the government. Without deciding the issue[42], the Court will apply *Pickering* as plaintiff urges. For even under the *Pickering* analysis, the Court finds the regulation to be constitutional.

In *Pickering*, 391 U.S. at 568, 88 S.Ct. at 1734, the Court held that

> [t]he problem in any case is to arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the [government], as an employer, in promoting the efficiency of the public services it performs through its employees.

*Accord, Letter Carriers, supra*, 413 U.S. at 564, 93 S.Ct. at 2889. The government has stated that Section (A)(3) was promulgated (1) to avoid any possible appearance that the Postal Service is involved, through its employees, in the political process, Thomas Aff. at ¶¶ 15, 16; and (2) to prevent coercion or the appearance of coercion of other postal employees who might feel pressured either to register against their wishes, or to register a certain way. *Id.* at ¶ 16.

 The Supreme Court has held these justifications to be valid in other First Amendment cases. *See, e.g., U.S. v. Grace, supra*, 103 S.Ct. at 1710 (avoidance

---

**39.** The government argues that *Letter Carriers, supra*, 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973) governs review of Section (A)(3), and that the relevant inquiry is whether the regulation furthers legitimate governmental goals. *See* Defts. Opp. at 3–4, and Defts. Mem. at 7.

**40.** *See Pickering, supra*, 391 U.S. at 568, 572–74, 88 S.Ct. at 1736–37.

**41.** Simply put, the facts and issues in *Pickering* seem materially different from the facts and issues of this case. In *Pickering* the plaintiff, a school teacher, had been dismissed from his job for publishing a letter in a local newspaper which criticized the manner in which the school board had handled proposals to raise revenue. Thus, the issue was not whether the employer (school board) could *regulate* the employee's speech on school premises, but rather whether the employer could *completely suppress* the teacher's speech, expression, and views. The school board attempted to deny completely the

right of the teacher to comment on matters of public interest—a fundamental value which the First Amendment seeks to protect. In this case, postal employees remain free to comment on politics and other matters of public interest, even while at work; they remain free to comment and to register voters off postal premises. Thus the restriction in the case at bar is much more limited than the wholesale ban on critical comment in *Pickering*.

**42.** The bottom line is that the facts of this case do not fit neatly within any of the well-recognized First Amendment analyses or categories. In some ways (A)(3) is an "access" regulation, suggesting a *Perry*-type analysis. Even more basically, the regulation could be viewed as a simple content-neutral, time-place-manner restriction. Under either analysis this Court would uphold the constitutionality of (A)(3).

of appearance of partisanship valid justification); *Letter Carriers, supra,* 413 U.S. at 565, 93 S.Ct. at 2890 (same); and *id.* at 566, 93 S.Ct. at 2890 (avoidance of coercion valid justification). The potential for coercion of fellow postal workers is especially real in this case [43]. As discussed above, postal employees remain free, *at work,* to express their private, partisan opinions and to urge their co-workers to vote or register in a particular way [44]. If postal employees were also permitted to register their co-workers at work, there would be instantaneous combustion: as a private citizen the employee could urge his co-workers to vote for candidate X, while under (A)(3) he could register the co-workers with candidate X's party. The result would be coercion and partisan registration.

■ Moreover, there is already some evidence that previous registration drives in certain locales were not conducted in an altogether benign fashion. In the New York Metro area the registration form used by the APWU has a space for marking party affiliation, and the forms are returnable to APWU officials instead of directly to a Board of Election [45]. By this method, APWU could find out what party a worker is affiliated with and, if not "politically correct", exert pressure on the worker to change.

Finally, as the Supreme Court has recognized, coercion may be tacit as well as express and still be real. *See Letter Carriers, supra,* 413 U.S. at 566, 93 S.Ct. at 2890. The suggestion that postal employees and union members, some of whom might hold relatively high positions in the Postal Service or the union, could register co-workers and fellow union members in a nonpartisan fashion immediately calls to mind the scene, familiar to all former enlisted men, of the army pay line with the paymaster handing out checks, followed by the Red Cross representative collecting donations, followed by the staff sergeant silently watching who gave and who did not. The USPS's concern about coercion at the work place seems entirely reasonable in this case [46].

Since postal workers remain free to register voters (and to be registered) off postal premises, APWU's desire to be able to do this on premises is not sufficient to outweigh the government's interests in this case. Accordingly, the Court finds Section (A)(3) constitutional.

### III

For the foregoing reasons defendants' motion for summary judgment is granted, plaintiff's motion for summary judgment is denied, and this case is dismissed.

An appropriate order has been issued.

---

**43.** The government need not await and demonstrate an actual incident of coercion as plaintiff contends. If the government can demonstrate that the potential for coercion is real, it may adopt a prophylactic rule. *See Connick v. Myers, supra,* 103 S.Ct. at 1692 & n. 12; and *Perry* at n. 12.

**44.** *See* 5 C.F.R. § 733.111(a)(2); *see also* discussion *supra* at pp. 1360–1361.

**45.** *See supra* note 36.

**46.** The Supreme Court, in *Letter Carriers, supra,* 413 U.S. at 566, 93 S.Ct. at 2890 also rejected the argument that a prohibition on coercion would be sufficient to prevent the problem.

## APPENDIX A

### USE OF POSTAL PREMISES FOR VOTER REGISTRATION AND POLLING

Postmasters approached regarding the use of postal premises for registration and polling purposes should use the following guidelines:

A. Voter Registration. A postmaster may approve voter registration requests provided all the following conditions are met.

(1) The registration must be conducted by government agencies or nonprofit civic leagues or organizations that operate for the promotion of social welfare but do not participate or intervene in any political campaign on behalf of any candidate for any public office.

(2) Absolutely no partisan or political literature will be available, displayed, or handed out. This includes photographs or likenesses and cartoons of elected officials and candidates for public office.

(3) Postal employees must not participate in any voter registration activity conducted on Postal Service premises.

(4) The registration must not interfere with the conduct of usual postal business, postal customers, or postal operations.

(5) The organization will provide and be responsible for any equipment and supplies.

(6) Contributions may not be solicited.

(7) Access to the workroom floor is prohibited.

(8) Voter registration activities will not become permanent, but will be limited to an appropriate period before an election.

B. Polling. Approval to use postal premises as a polling place is given by the Postmaster General or his designee. A request to use a postal facility will be considered only if the facility is the only reasonable available place for voting in the area and the following conditions are met.

(1) The facility must be used as is and must not be materially altered to accommodate machines, voters or workers.

(2) The Postal Service will not provide any assistance in the installation or removal of items needed for voting or in the polling process itself.

(3) Voting must not interfere with normal postal business.

(4) Voter entrances and exits must be arranged to ensure the security of the mails.

(5) Workroom floor space may not be used for voting.

(6) Local law enforcement officials must agree in advance to enforce Postal Service regulations governing conduct on postal premises and all applicable state and local laws during the voting.

(7) The state or local government must agree in advance to reimburse any costs incurred by the Postal Service for additional security, utilities, or building operations necessary to allow the use of the facility for voting.

(8) There must be an absolute prohibition against the display or distribution of any political literature, badges, insignia, or posters on Postal Service premises, including parking areas.

Submit request to Headquarters, Delivery Services Department, Office of Delivery & Retail Operations through the Regional Postmaster General no fewer than 60 days before the election. A request must include complete details addressing each of the above conditions and a statement that there are suitable non-postal facilities available.

These procedures are intended to provide for the use of postal premises where they are truly needed for voting and, at the same time, to ensure that there is no disruption of postal services.—*Delivery Services Dept., 12-1-83.*

### UNIFORM PROGRAM—LICENSED VENDOR LISTING

Each of the following uniform vendors has received a vendor's license since distribution of Publication 136, *Licensed Vendor Listing.* These lists must be posted where they are readily available for employees to read.

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Army Navy Store | 322 N. Higgins Avenue | Missoula | MT | 59802 | Military Surplus of South Florida | 18651 S.W. 107th Avenue | Miami | FL | 33157 |
| Blue Knight Uniforms | 217 Atlantic City Blvd. | Beachwood | NJ | 08722 | | | | | |
| California Footwear | 3048 Rolison Road | Redwood City | CA | 94063 | North Fork | 417 Delaware Street | Kansas City | MO | 64105 |
| Cesar's Shoe World | 1924 E. Sahara | Las Vegas | NV | 89104 | | | | | |
| | | | | | Red Wing Shoe Store | 5208 Aldine Mail Route | Houston | TX | 77039 |
| E&E Uniform Supply | 402 Main Street | Carmine | TX | 78939 | | | | | |
| Louis Weisz Shops | 5620 N. Broad Street | Philadelphia | PA | 19141 | The Bootery | 1400 Allentown Road | Lima | OH | 45805 |

*—Labor Relations Dept. 12-1-83.*