**MONTEREY COUNTY DEMOCRATIC CENTRAL COMMITTEE; Alice Ellis; and Dorothy Lund, Plaintiffs-Appellants,**

v.

**UNITED STATES POSTAL SERVICE; William F. Bolger, Postmaster General; Joseph R. Caraveo, Regional Postmaster; Manuel Subia, District Manager; and Terry Williams, Postmaster, Defendants-Appellees.**

No. 85–1685.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 12, 1985.

Decided March 17, 1987.

Douglas R. Young, San Francisco, Cal., for plaintiffs-appellants.

* Honorable Jesse W. Curtis, United States District Judge, Central District of California, sitting by designation.

Edward R. Cohen, Washington, D.C., for defendants-appellees.

Before TANG and BRUNETTI, Circuit Judges, and CURTIS, District Judge.*

BRUNETTI, Circuit Judge:

The Monterey County Democratic Central Committee and two of its members (the Committee) challenge a district court order denying the Committee's request for an injunction of a United States Postal Service guideline prohibiting voter registration by partisan groups on postal premises. We affirm.

*FACTUAL AND PROCEDURAL BACKGROUND*

In December 1983 the United States Postal Service (Postal Service) promulgated a guideline permitting voter registration on postal premises under certain conditions and only by certain groups. Postal Bulletin 21434, 12-1-83 at 9, *reproduced in* Appendix A, *infra.* Section (A)(1) of the guideline defines permissible registrars as "government agencies or non-profit civic leagues or organizations that operate for the promotion of social welfare but do not participate or intervene in any political campaign on behalf of any candidate for any public office."

In July 1984 the Committee sought permission to register voters at the Post Office in Carmel Valley, California (Post Office). The Committee proposed to seat its members at tables located on a covered walkway adjacent to the Post Office. The walkway is separated from municipal sidewalks by the Post Office parking area. Photographs *reproduced in* Appendix B, *infra.* Terry Williams, Postmaster of the Carmel office, denied the Committee's request, finding that the Committee was a partisan group not authorized to conduct voter registration under section (A)(1).

The district court preliminarily enjoined enforcement of the guideline but later granted summary judgment in favor of the Postal Service. We review an order of summary judgment *de novo. Ashton v. Cory,* 780 F.2d 816, 818 (9th Cir.1986).

## DISCUSSION

The Committee contends that by excluding partisan groups from voter registration activities on Post Office property, the guideline deprives them of their first amendment right of free expression and fifth amendment equal protection guarantees.

### A. *The Public Forum Doctrine and the First Amendment*

■ The parties do not dispute that voter registration is speech protected by the first amendment to the United States Constitution. This protection, however, is not in all cases absolute. *See Heffron v. Int'l Society for Krishna Consciousness, Inc.,* 452 U.S. 640, 647, 101 S.Ct. 2559, 2564, 69 L.Ed.2d 298 (1981) ("the First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired"). *See also Adderley v. Florida,* 385 U.S. 39, 47–48, 87 S.Ct. 242, 247–48, 17 L.Ed.2d 149 (1966). The values embodied in the first amendment are expressed through rules that balance tenets of free expression—principles constituting the hallmark of free societies—with practical assessments of the suitability of the forum. The nature of the forum selected by the speaker determines which rule governs.

Fora are grouped into three categories. The first includes places which "by long tradition or government fiat" have been utilized for assembly and debate. *Perry Education Assoc. v. Perry Local Educators' Assoc.,* 460 U.S. 37, 45, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983). Public fora typically include streets, sidewalks and parks. *Id.* Government authority to regulate speech in these "quintessential" public fora is greatly limited. *Id.* In such places, communication may not be entirely prohibited. Content-based exclusions are impermissible unless justified by a compel-

ling state interest narrowly tailored to achieve that end. *Id.* The government may enforce content-neutral regulations concerning time, place and manner of expression which are narrowly drawn to serve "a significant government interest, and leave open ample alternative channels of communication." *Id.*

A second category of forum includes public property opened and designated by the state for the public as a place of expressive activity. *Id.* The government does not create a public forum through unconscious, unspoken practices or by permitting limited discourse, but "only by intentionally opening a non-traditional forum for public discourse." *Cornelius v. NAACP Legal Defense and Education Fund, Inc.,* 473 U.S. 788, 105 S.Ct. 3439, 3449, 87 L.Ed.2d 567 (1985). Courts refer to such fora as "limited" public fora, *Perry,* 460 U.S. at 48, 103 S.Ct. at 956, or public fora "by designation." *Cornelius,* 105 S.Ct. at 3450. First amendment questions involving these places are controlled by the rules applicable to traditional public fora.

Public fora by designation often will be narrowly defined. Thus, when limited discourse is permitted by select groups, a public forum open to indiscriminate use by all is not created. *Cornelius,* 105 S.Ct. at 3449. In such instances a limited public forum results, extended only to the original recipients of the government's permission and to entities similar in character. *Perry,* 460 U.S. at 47–48, 103 S.Ct. at 956–57. Once opened, a limited public forum is not guaranteed an indefinite existence; the government may choose to close it and devote the property exclusively to its preexisting purposes. 460 U.S. at 46, 103 S.Ct. at 955.

The third category consists of nonpublic fora. In describing the government's powers to regulate these places, the Supreme Court has stated: "the State may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely

because public officials oppose the speaker's view." *Id.*

It is the Committee's position that the walkway is a traditional public forum. The guideline, they argue, furthers no compelling government interest and thus cannot withstand the heightened scrutiny applied to regulations of public fora. We disagree.

■ Public places of outdoor pedestrian traffic—sidewalks—long have been representative of areas held open to the public for expressive activities. *United States v. Grace*, 461 U.S. 171, 179, 103 S.Ct. 1702, 1708, 75 L.Ed.2d 736 (1983). That a sidewalk is situated on publicly owned property without more, however, is insufficient to accord it public forum status. "The state, no less than a private owner of property, has power to preserve property under its control for the use to which it is lawfully dedicated." *Adderley v. Florida*, 385 U.S. 39, 47, 87 S.Ct. 242, 247, 17 L.Ed.2d 149 (1966).

■ We are aided in our analysis by the Supreme Court's opinion in *Greer v. Spock*, 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976), and the Court's more recent comments on that case. In *Greer*, several political candidates initiated court proceedings in an effort to gain access to the sidewalks and streets within the Fort Dix Military Reservation to discuss campaign issues with service personnel and their families and to distribute related literature. Although the streets and sidewalks in question were separate from municipal roads and sidewalks, they were open to civilian vehicular and pedestrian traffic. At the unguarded entrance to the fifty-five-square-mile installation, a sign was displayed welcoming visitors. Nonetheless, because the premises were devoted to military training—an activity incompatible with the maintenance of a public forum—the Supreme Court upheld regulations prohibiting expressive activities by the public. *Id.* at 836–38, 96 S.Ct. at 1216–18. In a subsequent case, *United States v. Grace*, the Court drew authority from *Greer* to construct a rule stressing the separateness of the military's walkways from the municipal ones in *Greer*: the rule allows the govern-

ment to overcome the presumption that sidewalks are public fora when the federally owned sidewalk obviously is separate from municipal sidewalks, apprising those who approach of the difference. 461 U.S. at 180, 103 S.Ct. at 1708.

The Court in *Grace*, was asked to strike down a statute prohibiting certain expressive activities on the Supreme Court grounds and the sidewalk forming the perimeter. The Court distinguished *Greer*, finding that the sidewalks surrounding the grounds retained their public forum status because no apparent separation existed to indicate to persons stepping from the street to the curb "that they have entered some special type of enclave." *Id.* The Court stated that "[t]he sidewalks comprising the outer boundaries of the Court grounds are indistinguishable from any other sidewalks in Washington, D.C., and we can discern no reason why they should be treated any differently." *Id.*

■ This distinction is pivotal in the instant case. The Carmel Post Office walkway is separated from the municipal sidewalks by the Post Office parking area. The isolated nature of the building and the surrounding walkway indicate to all who approach that the walkway services postal patrons entering the building and that it is not a thoroughfare for passersby intent on other errands. This fact is sufficient to overcome the presumption of public forum status otherwise accorded sidewalks. Accordingly, we find the postal walkway analogous to the sidewalk at issue in *Greer* and conclude that it is not a traditional public forum.

■ The Committee argues that even if the walkway is not a traditional public forum, government attempts to regulate its use for expressive activities still must be analyzed under the rules applicable to public fora because the Postal Service transformed the walkway into a limited public forum by permitting certain groups to use postal premises for expressive activities. Here, again, we disagree. The Post Office property at Carmel has been used by the Red Cross for blood drives and by the

Lions Club for fundraising. A political candidate once campaigned in the parking lot and a property owners association activity was permitted on the premises. At no time, however, did the Postal Service swing wide the doors to indiscriminate use by the public. The "government does not create a public forum ... by permitting limited discourse, but only by intentionally opening a non-traditional forum for public discourse." *Cornelius*, 105 S.Ct. at 3449. Here, the uses made of the property were limited, and such "selective access does not transform government property into a public forum." *Perry*, 460 U.S. at 47, 103 S.Ct. at 956.

■ Even were we to conclude that a limited public forum resulted from this history of use, a constitutional right of access would not extend to the Committee because we find that the Committee is dissimilar to the groups previously admitted to the property. *Perry*, 460 U.S. at 48, 103 S.Ct. at 956. This result is unaltered by the Postal Service guideline allowing specific groups to register voters. To be sure, the guideline created a limited public forum. The forum, however, is limited to entities of the character expressly described. The Committee patently is not a group that does "not participate or intervene in any political campaign on behalf of any candidate for any public office." The Postal Service may restrict access to its premises in a manner consistent with the guideline's established limitations. *Id.* Therefore the Committee would, in any event, be excluded from the forum.

Our analysis is bolstered by the decisions of other courts previously faced with a similar situation. In *American Postal Workers Union v. United States Postal Service*, 764 F.2d 858, 861 (D.C.Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 792, 88 L.Ed.2d 770 (1986), a postal workers' union was denied permission by the Postal Service to conduct a voter registration drive among postal workers and the general public on postal premises. The denial,

which put an end to the union's long-standing practice of registering voters on postal property, was based on the guideline at issue here. The district court found that the union's participation in a candidate's campaign brought the union within the prohibited group of voter registrars. 595 F.Supp. 1352, 1360 (D.D.C.1984).[1] The court of appeals agreed and concluded that post office premises are neither a traditional public forum nor a limited one, noting that while postal property had been opened by the guideline for the purpose of registering voters, the union was not of similar character to the entities that enjoyed access under the regulation. 764 F.2d at 861.

Because the Carmel Valley Post Office walkway is not a traditional or limited public forum open to the Committee, we need not determine whether the regulation is supported by a compelling government interest. Rather, we apply the rules governing nonpublic fora to determine whether the regulation on speech is reasonable and whether it does not simply mask Postal Service opposition to the Committee's views. 460 U.S. at 46, 103 S.Ct. at 955.

Initially we note that government control over non-public fora includes:

> [t]he right to make distinctions in access on the basis of subject matter and speaker identity. These distinctions may be impermissible in a public forum but are inherent and inescapable in the process of limiting a nonpublic forum to activities compatible with the intended purpose of the property. The touchstone for evaluating these distinctions is whether they are reasonable in light of the purpose which the forum at issue serves.

*Id.* at 49, 103 S.Ct. at 957. *See also Cornelius*, 105 S.Ct. at 3453. Nothing suggests the Postal Service intended to discourage one viewpoint and advance another. We reject the Committee's expansive characterization of the collective position of all partisan groups as a "viewpoint." By excluding all partisan groups from engaging in voter

---

1. The court of appeals endorsed the district court's commendable constitutional analysis of section (A)(1) of the guideline, 764 F.2d at 861, but vacated and remanded other aspects of the decision.

registration—conduct permitted by non-partisan groups—the Postal Service is not granting to "one side of a debatable public question ... a monopoly in expressing its views...." *City of Madison Joint School District No. 8 v. Wisconsin Employment Relations Commission,* 429 U.S. 167, 175, 97 S.Ct. 421, 426, 50 L.Ed.2d 376 (1976). As in *Perry,* our focus must be on the character of the entities, not the views they espouse. In *Perry,* a school employee union challenged a regulation making school personnel mailboxes accessible exclusively to a rival union elected as the employees' official bargaining representative. The Supreme Court found greater accuracy in characterizing the policy as based on the unions' status and not on their respective views. 460 U.S. at 49, 103 S.Ct. at 957. Accordingly, we find that section (A)(1) of the guideline is viewpoint neutral.

■ The rationale advanced for the regulation is the Postal Service's desire not to be viewed by the public as maintaining partisan associations. This desire is reasonable. The Postal Service has been directed to develop and maintain "an efficient system of collection, sorting and delivery of the mail nationwide." 39 U.S.C. § 403(b)(1). In meeting this objective, the Postal Service more than any other agency of government[2] daily serves a staggering number of individuals. Not surprisingly, the Postal Service is the "Nation's largest user of floor space" and is among the world's largest employers. *United States Postal Service v. Council of Greenburgh Civic Assoc.,* 453 U.S. 114, 122, 101 S.Ct. 2676, 2681, 69 L.Ed.2d 517 (1981). The Postal Service reasonably could conclude that its freedom from the appearance of involvement in the political process is critical to its ability to carry out its charge.

This reason previously has been found a legitimate and reasonable justification for regulating nonpublic fora. In *Cornelius,*

the Court stated that "avoiding the appearance of political favoritism is a valid justification for limiting speech in a nonpublic forum." 105 S.Ct. at 3453. In *American Postal Workers,* the court of appeals adopted this view, holding that the "Postal Service interest in avoiding an appearance of involvement in the political process is reasonably promoted by restricting on-premises registration to clearly non-partisan organizations." 764 F.2d at 861.

■ The Committee errs in attacking the guideline on the basis that less restrictive means exist to advance the Postal Service's interest. The Supreme Court in *Cornelius* made clear that "[t]he Government's decision to restrict access to a nonpublic forum need only be *reasonable*; it need not be the most reasonable or the only reasonable limitation." 105 S.Ct. at 3453 (emphasis in original). The Committee states that the Post Office is a natural meeting place,[3] implying perhaps that the convenience of the location as a place for Committee members to register voters should compel a result that would permit access to the walkway. The first amendment, however, does not require that the most efficient avenue of expression be made available. *Id. See Council of Greenburgh,* 453 U.S. at 129, 101 S.Ct. at 2685 (that it was more efficient for a civic association to deliver unstamped messages in mailboxes did not confer public forum status on mailboxes). We conclude that the guideline is reasonable and properly applied to the Committee.

### B. *Equal Protection Guarantees*

■ Our first amendment analysis also resolves the second issue raised in this appeal: whether the Postal Service's application of the guideline operates to deprive the Committee of equal protection guarantees under the fifth amendment. While distinctions between classes of speech may unconstitutionally burden equal protection

---

2. Although the Postal Service was a creature of Congress and to that extent purely a government entity, it subsequently was transformed into a government-owned corporation in an effort to stem a tide of deficits and shortcomings. *See Council of Greenburgh,* 453 U.S. at 122, 101 S.Ct. at 2681.

3. We note that the Committee does not contend that no alternative channels of communication exist.

rights, *see Police Department of Chicago v. Mosley*, 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972) (ordinance unconstitutionally allowed labor picketing but prohibited non-labor picketing); *Carey v. Brown*, 447 U.S. 455, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980) (statute made unconstitutional distinction between peaceful labor picketing and other peaceful picketing), the viability of equal protection claims relating to expressive conduct is contingent upon the existence of a public forum. *Perry*, 460 U.S. at 55, 103 S.Ct. at 960. Only when rights of access associated with a public forum are improperly limited may we conclude that a fundamental right is impinged. *Id.* at 54, 103 S.Ct. at 959.

The Committee can lay no claim to a fundamental right of access here because the applicable forum is nonpublic. In such cases, regulations of government property which affect expressive conduct will be upheld if they "rationally further a legitimate state purpose." *Id.* As we have explained, the test is met here with little difficulty; the reason advanced by the Postal Service for the guideline is legitimate and rationally furthered by the regulation.

The decision of the district court is AFFIRMED.

TANG, Circuit Judge. Concurring in the judgment:

I agree with the majority that the Postal Services guideline, as it has been applied to the Carmel Valley Post Office, does not offend first amendment principles. I write separately only to stress that this result is mandated by the particular physical layout of the walkway on the postal service premises in Carmel Valley. I do not find our conclusion to be bolstered by the result in *American Postal Workers Union v. United States Postal Service*, 764 F.2d 858, 860 (D.C.Cir.1985), *cert. denied*, — U.S. —, 106 S.Ct. 792, 88 L.Ed.2d 770 (1986), because the District of Columbia Court of Appeals considered the guideline as it applied to voter registration drives conducted in post office lobbies, cafeterias, "swing rooms" and break areas. Because side-

walks were not involved, I do not find the opinion particularly helpful in evaluating the operation of the guideline at the Carmel Valley Post Office.

My reading of Supreme Court precedent is that sidewalks are presumptively public fora unless they are (1) located within government property "dedicated to a use other than as a forum for public expression" and (2) "separated from the streets and sidewalks of any municipality." *United States v. Grace*, 461 U.S. 171, 179, 180, 103 S.Ct. 1702, 1708, 75 L.Ed.2d 736 (1983). The expressive function of streets and sidewalks can be lost when those streets are enclosed within a military reservation which has no historic function as "a place for free public assembly and communication of thoughts." *Greer v. Spock*, 424 U.S. 828, 838, 96 S.Ct. 1211, 1217, 47 L.Ed.2d 505 (1976).

In this case, because the Carmel Valley Post Office walkway is enclosed within the postal service premises and clearly separated from the municipal sidewalks in the area, *Grace* and *Greer* support the conclusion we reach, that the regulation does not offend the first amendment. I think it is important to acknowledge that, in thus applying *Grace* and *Greer*, we allow forum analysis to turn on the placement of sidewalks on Post Office property, rather than on legal title to the premises. I am aware that this analysis might appear to create an arbitrary rule so that another Post Office, with a different arrangement of sidewalks and parking facilities, might have to permit unrestricted voter registration on its sidewalks. This decision of course does not decide the outcome of any other challenge to this regulation. However, it is logical and reasonable to distinguish, for purposes of first amendment analysis, between sidewalks separated from municipal sidewalks by a parking lot and sidewalks indistinguishable from municipal sidewalks. Considering the principles implicated by the first amendment, it is reasonable to grant the Post Office greater regulatory control over sidewalks which appear to a lay person to be within Post Office premises, than we permit it to exercise over sidewalks which appear only to border those premis-

es. Such a delineation of Post Office control, based on the nature of the forum, rather than legal ownership of the premises, comports with the Postal Service's professed concern with preserving neutrality in the public eye.

## APPENDIX A

### USE OF POSTAL PREMISES FOR VOTER REGISTRATION

Postmasters approached regarding the use of postal premises for registration ... purposes should use the following guidelines:

**A. Voter Registration. A postmaster may approve voter registration requests provided all the following conditions are met.**

(1) The registration must be conducted by government agencies or nonprofit civic leagues or organizations that operate for the promotion of social welfare but do not participate or intervene in any political campaign on behalf of any candidate for any public office.

(2) Absolutely no partisan or political literature will be available, displayed, or handed out. This includes photographs or likenesses and cartoons of elected officials and candidates for public office.

(3) Postal employees must not participate in any voter registration activity conducted on Postal Service premises.

(4) The registration must not interfere with the conduct of usual postal business, postal customers, or postal operations.

(5) The organizations will provide and be responsible for any equipment and supplies.

(6) Contributions may not be solicited.

(7) Access to the workroom floor is prohibited.

(8) Voter registration activities will not become permanent, but will be limited to an appropriate period before an election.

Postal Bulletin 21434, 12–1–83

fe

## APPENDIX B

GOVERNMENT EXHIBIT

1202

GOVERNMENT
EXHIBIT

GOVERNMENT
EXHIBIT

GOVERNMENT
EXHIBIT