**NAPA VALLEY PUBLISHING COMPANY, Plaintiff,**

v.

**CITY OF CALISTOGA, Defendant.**

**No. C–02–3176 EMC.**

United States District Court, N.D. California.

Sept. 6, 2002.

Roger R. Myers, Lisa Sitkin, Gregory K. Jung, Steinhart & Falconer, San Francisco, CA, for Plaintiff.

Michelle Marchetta Kenyon, Kevin D. Siegel, McDonough, Holland & Allen, Oakland, CA, for Defendant.

**ORDER GRANTING IN PART AND DENYING IN PART NAPA VALLEY PUBLISHING COMPANY'S MOTION FOR A PRELIMINARY INJUNCTION (No. 11)**

CHEN, United States Magistrate Judge.

Napa Valley Publishing Company (hereinafter "NVP"), a corporation of the state of Washington, publishes and distributes newspapers and periodicals in Napa County, California. More specifically, NVP publishes and distributes, *inter alia, The*

*Napa Valley Register,* a daily newspaper sold to local citizens for its news coverage, *Inside Napa Valley,* a free publication distributed primarily to visitors for its map and coverage of local businesses and events, and *Distinctive Properties,* a free guide featuring real property for sale in the area. NVP has distributed these publications in newsracks along the public walkways of the City of Calistoga for a number of years. In 2000, NVP distributed its publications in twenty-two separate newsracks.

The City of Calistoga (hereinafter the "City") is a historic town in the Napa Valley known for its tourism. The City is home to a number of day spas, visitor accommodations, restaurants and retail shops, etc. On February 6, 2001, the City, due in part to the growing sentiment of the City's merchants and citizens who felt that the newsracks affected the aesthetics and pedestrian safety of the City, in 2001, enacted Ordinance No. 570, codified as § 12.34 of the City's Municipal Code (hereinafter the "Ordinance"), regulating newsracks. The City adopted the Ordinance "to promote the public health, safety and welfare through the regulation of placement, appearance, number, size and servicing of newsracks on the public rights-of-way." Calistoga Muni.Code § 12.34.050(A).

The Ordinance limits the maximum number of newsracks which may be located on a city block to eight. In three locations, the Ordinance provides an exception to this rule, allowing up to twelve, and in one location up to sixteen. Where there are two or more newsracks in any

one location, the newsracks must be housed in a pedestal-mounted modular newsrack. A modular or cluster newsrack is one with two rows of compartments into which individual newsracks can be installed. Each module can accommodate from four to eight newsracks. The Ordinance also requires that newsracks, including modular newsracks, cannot be placed within two hundred feet of one another on the same city block.

Additionally, the Ordinance requires publishers to obtain encroachment and newsrack permits prior to the installation of any newsrack. And where the City receives more permit applications than permitted at a particular location, the Ordinance provides for the City to conduct a random lottery to allot the available newsrack spaces within the pedestal-mounted newsrack.

In March 2001, no lottery was held because the publishing companies who had previously distributed their publication in the City prior to the Ordinance's enactment were able to divide the available newsracks amongst themselves.

Sometime after the initial installation of the pedestal-mounted newsracks in 2001 and April 17, 2002, other publications applied for newsrack permits under the Ordinance at locations that had already reached the applicable newsrack limit. Because demand exceeded supply, the City conducted its first newsrack lottery in 2002.[1]

As a result of the lottery conducted on April 17, 2002, NVP lost the right to distribute its publications at five of its eighteen newsracks.[2]

1. Newsrack applications exceeded the newsrack limit at nine locations: Bank of the West; Brandon's; Café Sarafornia; Calistoga Inn; The Depot; Mr. Moon's; the United States Post Office; Smoke Shop; and Nance's. The original version of the Ordinance only provided for a one-time lottery. It

did not address the circumstance where additional publications vie for limited space. The City amended the Ordinance to permit an annual lottery. August 16, 2002 Supp. Decl. of Mario Van Dongen, ¶¶ 9 and 10, Ex. 2.

2. NVP lost five newsracks: two locations for *The Napa Valley Register,* two locations for

On June 4, 2002, NVP appealed the results of the April 17, 2002 lottery to the Calistoga City Council. NVP's appeal was denied. On June 17, 2002, the City notified NVP that it was required to remove its publications from the five newsracks within fifteen days.

On July 2, 2002, NVP filed a complaint against the City alleging violations of NVP's: [1] First and Fourteenth Amendment rights; [2] Due Process rights; [3] rights under the Equal Protection Clause; and [4] rights under the California Constitution.[3]

Thereafter, on July 17, 2002, the City notified NVP for a second time that it was required to remove its publications.

NVP appealed the City's notice of removal to the Calistoga City Council. On July 31, 2002, the City denied NVP's administrative appeal and ordered NVP to remove its publications within ten days (on or before August 10, 2002).

On August 8, 2002, NVP filed a motion for a temporary restraining order and preliminary injunction before the Court asserting as it primary basis NVP's First Amendment Claim. On August 9, 2002, due to this Court's unavailability, a hearing on the motion for temporary restraining order was held before the Honorable Charles R. Breyer. The District Court issued the temporary restraining order maintaining the status quo.

Additional briefs and evidentiary material were submitted by both parties and a hearing on the motion for a preliminary injunction was held on August 21, 2002, and taken under submission.

Having reviewed the briefs and accompanying evidentiary submissions filed by counsel and the record in this case, as well as having considered the oral argument of counsel on August 21, 2002, the Court makes the following determinations.

## *ANALYSIS*

### A. Legal Standard

A preliminary injunction is a provisional remedy, the purpose of which is to preserve status quo and to prevent irreparable loss of rights prior to final disposition of the litigation. *Sierra On Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1422 (9th Cir.1984). The trial court may grant a temporary restraining order or preliminary injunction in the exercise of its equitable powers. Fed R. Civ. P. 65. It does so in the exercise of its discretion. *See Schneider v. California Department of Corrections*, 91 F.Supp.2d 1316, 1327 (N.D.Cal.2000), *citing, Big Country Foods, Inc. v. Board of Educ. of Anchorage School Dist.*, 868 F.2d 1085, 1087 (9th Cir. 1989). Generally, to obtain preliminary injunctive relief, a moving party must show a threat of irreparable injury and the inadequacy of legal remedies, the conventional requisites for equitable relief. *See Arcamuzi v. Continental Air Lines, Inc.*, 819 F.2d 935, 937 (9th Cir.1987); *Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1495 (9th Cir.1996).

In addition, the issuance of preliminary injunctive relief rests upon consideration of four factors: [1] the likelihood of the plaintiffs' success on the merits; [2] the threat of irreparable harm to the plaintiffs if the injunction is not imposed; [3] the relative balance of this harm to the plaintiffs and the harm to the defendants if the injunction is imposed; and [4] the pub-

---

*Inside Napa Valley,* and one location for *Distinctive Properties.* The five locations in the City are: Bank of the West, Café Sarafornia, Calistoga Inn, The Depot and Nance's. NVP had also lost three additional locations when it ceased publishing *Tiempo Latino* not a result of the April 17, 2002 lottery.

**3.** On July 23 and 24, 2002, the parties consented to proceed before a this Court.

lic interest. *Los Angeles Memorial Coliseum Commission v. National Football League,* 634 F.2d 1197, 1200–01 (9th Cir. 1980).

■ The Ninth Circuit has encompassed these factors into a two-prong test. To qualify for preliminary injunctive relief, the moving party must show " 'either [1] a likelihood of success on the merits and the possibility of irreparable injury, or [2] that serious questions going to the merits were raised and the balance of hardships tips sharply in [the moving party's] favor.' " *Sun Microsystems, Inc. v. Microsoft Corp.,* 188 F.3d 1115, 1119 (9th Cir.1999), *quoting, Sega Enterprises, Ltd. v. Accolade, Inc.,* 977 F.2d 1510, 1517 (9th Cir. 1992). *See Schneider,* 91 F.Supp.2d at 1327. "These two formulations represent a continuum in which the required degree of irreparable harm increases as the probability of success decreases." *America West Airlines, Inc. v. National Mediation Board,* 119 F.3d 772, 777 (9th Cir.1997) (internal quotations omitted). *See Sun Microsystems,* 188 F.3d at 1119 (noting that the greater the moving party's relative hardship, the less probability of success must be shown); *Schneider,* 91 F.Supp.2d at 1327 ("These are not two distinct tests, but rather the opposite ends of a single continuum in which the required showing of harm varies inversely with the required showing of meritoriousness." (internal quotations omitted)). When an injunction would affect the public, the court must examine whether the public interest would be advanced or impaired by the issuance of a preliminary injunction. *Caribbean Marine Services Co. v. Baldrige,* 844 F.2d 668, 674 (9th Cir.1988).

### 1. Irreparable injury

The City initially argues that NVP cannot establish irreparable injury, if it is unable to show a likelihood of success on the merits. The City argues that if there is only a showing of serious questions on the merits, the threat to First Amendment rights is insufficient to permit injunctive relief.

■ The argument is meritless. It collapses two concepts. Inquiry into irreparable injury is separate and distinct from inquiry into the merits. The issue with respect to irreparable injury is whether, if the preliminary injunction is denied, the plaintiff can be made whole should it prove victorious at trial, *i.e.,* whether the loss or deprivation pending trial is reparable. The loss of money is the classic example of an interim loss that is fully remediable after trial. *L.A. Coliseum,* 634 F.2d at 1202 (irreparable harm not present where losses can be compensated by money damages). On the other hand, certain interim injuries such as an injury to the environment or to a copyright, become irretrievable once incurred and are not fully remediable. *See, e.g., Amoco Production Co. v. Village of Gambell,* 480 U.S. 531, 545, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987) (environmental injury); *Cadence Design Systems, Inc. v. Avant! Corp.,* 125 F.3d 824, 827 (9th Cir.1997) (presumption of irreparable harm in copyright infringement cases), *cert. denied,* 523 U.S. 1118, 118 S.Ct. 1795, 140 L.Ed.2d 936 (1998). Irreparability of injury pending trial turns on the nature of the loss and the ability of the court to make the plaintiff whole after the trial; it does not necessarily turn on the meritoriousness of the plaintiff's legal claim.

■ In this case, the loss threatened is the restriction on distribution of NVP's publications which would result from enforcement of the Ordinance and the April 17, 2002 lottery. NVP has proffered evidence it would lose significant readership if the challenged restrictions were implemented pending trial. Restrictions which impede speech inflict an immediate loss in

the opportunity to speak (or in this case, the opportunity to disseminate NVP's speech through its publications). That loss is especially significant (and irremediable) for a periodic publication whose publication loses value with each passing period. That lost opportunity to disseminate time sensitive speech cannot be remedied after trial. Preventing injury that cannot later be repaired is precisely the kind of irreparable injury that warrants preliminary injunctive relief. *See S.O.C., Inc. v. County of Clark*, 152 F.3d 1136, 1148 (9th Cir.1998) (finding irreparable injury where ordinance imposed unreasonable time, place and manner restriction on protected speech), *quoting, Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) ("the loss of First Amendment freedoms for even minimal periods of time unquestionably constitutes irreparable injury"); *Foti v. City of Menlo Park*, 146 F.3d 629, 643 (9th Cir.1998) (same); *One World One Family Now, Inc. v. State of Nevada*, 860 F.Supp. 1457, 1464 (D.Nev. 1994) (finding irreparable injury where charitable nonprofit organizations were precluded from selling message-bearing t-shirts using portable tables and signs on the Las Vegas Strip).

■ Furthermore, in addition to the lost opportunity to disseminate time-sensitive speech, if the challenged impingement on speech violates the First Amendment, the plaintiff also suffers the loss of a constitutionally-protected legal right. Violation of a constitutional right in, and of itself, constitutes irreparable injury. *See Topanga Press, Inc. v. City of Los Angeles*, 989 F.2d 1524, 1528–29 (9th Cir.1993) (constitutional rights), *cert. denied*, 511 U.S. 1030, 114 S.Ct. 1537, 128 L.Ed.2d 190 (1994); *Chalk v. United States District Court*, 840 F.2d 701, 710 (9th Cir.1988) (civil rights); *Zepeda v. United States Immigration and Naturalization Service*, 753 F.2d 719, 727 (9th Cir.1983) (constitutional rights). While this aspect of harm is related to the meri-

toriousness of a plaintiff's claim, even where the plaintiff has not demonstrated it is likely to prevail but instead establishes serious questions on the merits, it thereby establishes a distinct possibility that its constitutional rights would be violated absent the preliminary injunction. *Sammartano v. First Judicial District Court in, for County of Carson City*, 303 F.3d 959, 973 (9th Cir.2002) ("[E]ven if the merits of the constitutional claim were not clearly established at this early stage in the litigation, the fact that a case raises serious First Amendment questions compels a finding that there exists the potential for irreparable injury." (Internal quotations omitted)). Irreparable injury need not be established with certainty or even high probability; the distant possibility of such harm establishes a "serious threat of irreparable injury" sufficient to support preliminary injunctive relief. *See, e.g., id.; Foti*, 146 F.3d at 643; *Burkow v. City of Los Angeles*, 119 F.Supp.2d 1076, 1082 (C.D.Cal.2000).

### 2. The balance of hardships

NVP asserts that with respect to that prong of the preliminary injunction test involving "serious questions going to the merits," where First Amendment rights are at issue, it need only show the balance of hardships tips in its favor, not that the balance tips "sharply" in its favor. NVP cites to *Foti v. City of Menlo Park, supra*, for this proposition. However, the Court is not convinced that *Foti* establishes a new and different standard for preliminary injunctive relief. While *Foti* omits the term "sharply" in its description of the balance of hardships, the omission is insignificant. Telling is *Foti's* citation to *Gilder v. PGA Tour, Inc.*, 936 F.2d 417, 422 (9th Cir.1991). *Gilder* states that " '[t]he critical element in determining the test to be applied is the relative hardship to the parties. If the balance of harms tips *decided-*

*ly* toward the plaintiff, then the plaintiff need not show as robust a likelihood of success on the merits as when the balance tips less *decidedly.*'" *Gilder,* 936 F.2d at 422 (emphasis added), *quoting, Benda v. Grand Lodge of Int'l Ass'n of Machinists & Aerospace Workers,* 584 F.2d 308, 315 (9th Cir.1978), *cert. dismissed,* 441 U.S. 937, 99 S.Ct. 2065, 60 L.Ed.2d 667 (1979). The Court sees no significance between the terms "decidedly" and "sharply" and refuses to impute to the Ninth Circuit on such a bare thread, an intent to modify the general test applicable to preliminary injunctions. Additionally, the Court notes post *Foti,* numerous trial courts have applied the traditional test for a preliminary injunction in First Amendment cases, requiring that the hardships tip "sharply" in favor of the plaintiffs where the plaintiffs only establish serious questions on the merits. *See, e.g., Thousand Oaks City v. Verizon Media,* No. CV 02–2553, 2002 WL 987910, *4 (C.D.Cal. May 15, 2002); *Mardi Gras of San Luis Obispo v. City of San Luis Obispo,* 189 F.Supp.2d 1018, 1025 (C.D.Cal.2002); *San Jose Christian College v. City of Morgan Hill,* No. C01–20857, 2001 WL 1862224, *1 (N.D.Cal. Nov.14, 2001); *Eller Media Co. v. City of Oakland,* No. C98–2237, 1998 WL 549494, *3 (N.D.Cal. Aug 28, 1998).

As noted above, the First Amendment interest may well inform the calculus in the balance of hardships, but it does not change the applicable standard.

Accordingly, the Court examines the merits of NVP's legal challenges to the Ordinance and the respective balance of hardships under the traditional test applicable in this Circuit.

## B. Legal Challenges to the Ordinance

■ At the outset, it is undisputed that NVP's right to sell *The Napa Valley Register* and distribute other publications in newsracks within the city limits of Calisto-

ga is constitutionally protected by the First Amendment. *See Gannett Satellite Info. Network v. Metropolitan Transportation Authority,* 745 F.2d 767, 772 (2d Cir. 1984). The First Amendment, however, "does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired," *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.,* 452 U.S. 640, 647, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981), and under certain circumstances, a municipality may impose reasonable time, place and manner restrictions on the exercise of First Amendment rights. The municipality possesses the burden, however, as the City concedes, of proving the constitutionality of the Ordinance. *See United States v. Playboy Entertainment Group, Inc.,* 529 U.S. 803, 816, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000) ("When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions.").

Here, NVP bases its motion for a preliminary injunction on two challenges to the Ordinance. First, it contends that the Ordinance grants excessive discretion to the City to grant or deny the permits required for the installation and use of newsracks. Second, NVP challenges the numerical limits on newsracks permitted and the allocation of resulting scarcity by annual lottery as an invalid time, place and manner restriction on speech.

### 1. Statute of Limitations

As a threshold question, the City argues that NVP is precluded from challenging the Ordinance due to the one-year statute of limitation which runs from the time the Ordinance was passed (February 6, 2001). For this proposition, the City cites *Acuna v. The Regents of the University of California,* 56 Cal.App.4th 639, 645–46, 65 Cal. Rptr.2d 388 (1997) (determining that an

one year statute of limitations applied to a wrongful termination action where the university allegedly terminated a professor based on his political views). However, *Acuna* involves an "as-applied" challenge as opposed to a facial challenge to legislation.[4]

In this case, NVP purports to challenge the Ordinance on its face. The statute of limitations does not apply to the facial challenge of a statute that infringes First Amendment freedoms as such a statute inflicts a continuing harm. *See 3570 East Foothill Blvd., Inc. v. City of Pasadena*, 912 F.Supp. 1268, 1278 (C.D.Cal. 1996) (noting that such a challenge is different in a takings context because there the very enactment of the statute inflicts harm); *Santa Fe Springs Realty Corp. v. City of Westminster*, 906 F.Supp. 1341, 1364–65 (C.D.Cal.1995) ("Because strong policy reasons militate in favor of permitting facial challenges to statutes that impinge upon protected First Amendment rights, the statute of limitations should not preclude a plaintiff from bringing a facial challenge more than one year after the statute is enacted."). *See also National Advertising Co. v. City of Raleigh*, 947 F.2d 1158, 1168 (4th Cir.1991), *cert. denied*, 504 U.S. 931, 112 S.Ct. 1997, 118 L.Ed.2d 593 (1992). Moreover, even if the City's statute of limitations defense applied to those aspects of NVP's claims which might be construed as an as-applied challenge to the Ordinance, the statute of limitations defense begins to run as of the date of the challenged application, *e.g.*, when the party seeks and is denied a permit under the statute. *See Gilbert v. City of Cambridge*, 745 F.Supp. 42, 49 (D.Mass. 1990), *aff'd*, 932 F.2d 51 (1st Cir.1991), *cert. denied*, 502 U.S. 866, 112 S.Ct. 192, 116 L.Ed.2d 153 (1991). In the case at bar, the City's denial of NVP's newsrack locations based on the results of the April 17, 2002 lottery is within a year of this suit.

Thus, at this juncture, the City has not demonstrated that this suit is likely barred.[5]

## 2. The City's unbridled discretion in the issuance of permits under the Ordinance

### a. Merits

Where a city vests unbridled discretion in the hands of a government official or agency in issuing a permit for speech, it imposes a prior restraint. *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 757, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988). *See S.E. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 552–53, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975) (stating that a prior restraint is found where a party must apply to a government body prior to its exercise of its First Amendment rights for a permit). A prior restraint is presumptively unconstitutional. *Forsyth County, Ga. v. The Nationalist Movement*, 505 U.S. 123, 131–32, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992).

The critical question is whether the restraint presents an intolerable risk of censorship. The seminal case applicable here is *City of Lakewood, supra*. In *City of Lakewood*, the defendant city enacted an

---

**4.** Moreover, *Acuna, supra,* was a suit for damages seeking retrospective monetary relief for a discrete act. Where challenged conduct is on-going, the threat of future harm arguably is continuing. The City has not cited any case in which a court has found a suit for injunctive relief to prevent future harm is barred by the statute of limitations.

**5.** The City has filed a motion to dismiss based in part on its statute of limitations arguments. Because this issue has not been fully briefed, the Court indicates its view at this point is merely tentative.

ordinance regulating newsracks within city limits. The ordinance gave the defendant city's mayor the authority to grant or deny newsrack permit applications and only required the mayor to "state the reasons for such denial." *City of Lakewood,* 486 U.S. at 753, 108 S.Ct. 2138. Where the mayor granted the permit application, the permit was subject to several terms and conditions such as, *inter alia,* the approval of the newsrack design and "any other terms and condition deemed necessary and reasonable by the [m]ayor." *Id.* at 754, 108 S.Ct. 2138. The plaintiff, a newspaper publisher, did not seek a permit, but instead brought suit to challenge the constitutionality of the ordinance on its face. The Supreme Court found that a facial challenge was proper and that the plaintiff was not required to seek and suffer denial of a permit in order to bring suit. *Id.* at 759, 108 S.Ct. 2138.

The Court found that "the ordinance itself contain[ed] no explicit limits on the mayor's discretion," and that "nothing in the [ordinance] as written requires the mayor to do more than make the statement 'it is not in the public interest' when denying a permit application." *Id.* at 769, 108 S.Ct. 2138 The Supreme Court concluded that allowing such an illusory constraint "to constitute standards necessary to [bind] a licensor's discretion renders the guarantee against censorship little more than a high-sounding ideal." *Id.* at 769–70, 108 S.Ct. 2138, *citing, Shuttlesworth v. City of Birmingham, Alabama,* 394 U.S. 147, 150–51, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969). The broad discretion gave government officials substantial power to discriminate based on the content or the viewpoint of the speech by suppressing disfavored speech or disliked speakers. *City of Lakewood,* 486 U.S. at 759–60, 108 S.Ct. 2138. The Court noted that:

> the absence of express standards makes it difficult to distinguish, "as applied," between a licensor's legitimate denial of

a permit and its illegitimate abuse of censorial power. Standards provide the guideposts that check the licensor and allow courts quickly and easily to determine whether the licensor is discriminating against disfavored speech. Without these guideposts, *post hoc* rationalizations by the licensing official and the use of shifting or illegitimate criteria are far too easy, making it difficult for courts to determine in any particular case whether the licensor is permitting favorable, and suppressing unfavorable, expression.

*Id.* at 758, 108 S.Ct. 2138. The Court thus noted that "the mere existence of the licensor's unfettered discretion, coupled with the power of prior restraint, intimidates parties into censoring their own speech, even if the discretion and power are never actually abused." *Id.* at 757, 108 S.Ct. 2138.

> It is not difficult to visualize a newspaper that relies to a substantial degree on single issue sales feeling significant pressure to endorse the incumbent mayor in an upcoming election, or to refrain from criticizing him, in order to receive a favorable and speedy disposition on its permit application. Only standards limiting the licensor's discretion will eliminate this danger by adding an element of certainty fatal to self-censorship.

*Id.* at 757–58, 108 S.Ct. 2138.

Thus, the scheme presented not only a danger of improper censorship, but because of the practical difficulties of proving such, a risk of self-censorship as well. *Id.* at 762, 108 S.Ct. 2138. Accordingly, because of the danger of content or viewpoint discrimination and risk of self-censorship inherent in the wide-ranging discretion afforded city officials, the Court found that those portions of the ordinance giving the mayor unfettered discretion to grant and deny newsrack permits and to impose conditions on those permits granted violated

the First Amendment. *Id.* at 772, 108 S.Ct. 2138.

*City of Lakewood* and its progeny make clear that " 'a law cannot condition the free exercise of First Amendment rights on the unbridled discretion of government officials.' " *Outdoor Systems, Inc. v. City of Mesa,* 997 F.2d 604, 613 (9th Cir.1993), *quoting, Gaudiya Vaishnava Society v. City and County of San Francisco,* 952 F.2d 1059, 1065 (9th Cir.1990), *cert. denied,* 504 U.S. 914, 112 S.Ct. 1951, 118 L.Ed.2d 555 (1992). "The mere existence of the licensor's unfettered discretion, coupled with the power of prior restraint, [intimidates parties into censoring their own speech], even if such discretion and power are never actually abused." *United States v. Linick,* 195 F.3d 538, 541 (9th Cir.1999) (internal quotations omitted). *See Young v. City of Simi Valley,* 216 F.3d 807, 819 (9th Cir.2000) ("completely discretionary, there is a danger that protected speech will be suppressed impermissibly because of the government official's . . . distaste for the content of the speech"), *cert. denied,* 531 U.S. 1104, 121 S.Ct. 844, 148 L.Ed.2d 723 (2001).

In the case at bar, the Ordinance requires a person (or publisher, etc.) seeking to distribute its publication via the use of a newsrack, to obtain two permits prior to the installation and use of a newsrack. Specifically, § 12.34.040 requires a person obtain both a newsrack permit and an encroachment permit prior to the installation of any newsrack. The Court will discuss each required permit and its respective prior restraint in turn.

### i. Newsrack permit

Calistoga Municipal Code § 12.34.040(B) requires any person placing a newsrack on any public sidewalk or parkway to first obtain a permit from the City. Subsection (C)(5) of the same section requires that the person submit, *inter*

*alia,* "A site plan showing the exact location of each newsrack and supporting or enclosing structure, and sufficient information to determine that the locations complies with Section 12.34.050 of this Chapter . . . ."

Section 12.34.050 referenced in § 12.34.040(C)(5) contains the standards for the installation, maintenance and operation of newsracks. It describes how newsracks must be placed, where they may be placed, the total number of newsracks possible on one block, the dimension and design of the newsracks, the maintenance of the newsracks, the advertising on the newsracks and the identification of a responsible person for the rack. *See* Appendix (Calistoga Muni.Code § 12.34.050).

Most of § 12.34.050's provisions are fairly clear, specific and non-discretionary. For example, subsection (A)(3) provides that "[n]o single newsrack may be placed within 200 feet of another single newsrack or modular newsrack on the same side of the street." Subsections (B)(5), (7) and (8) provide that newsracks shall not be placed within five feet of any marked crosswalk not at an intersection, fire hydrant, fire call box, police call box or other emergency facility, or driveway.

However, there are two provisions within § 12.34.050 which arguably grant a fair amount of discretion to the City to deny newsrack permit applications. Subsection (B)(1) provides that: "No newsrack shall be placed, installed, used, or maintained: when such installation, use or maintenance *endangers the safety of persons or property* " (emphasis added). Subsection (B)(3) provides that: "No newsrack shall be placed, installed, used, or maintained: when such newsrack *unreasonably interferes with or impedes the flow of pedestrian or vehicular traffic,* including legally parked or stopped vehicles, the ingress into, or egress from any place of business or residence, the use of poles, posts, traffic

signs or signals, hydrants, mailboxes, or other objects at or near the location" (emphasis added).

NVP contends that these standards for the installation, maintenance and operation of newsracks do not provide sufficient limits on the City's discretion. For this proposition, NVP cites a district court case, *Chicago Newspaper Publishers v. City of Wheaton,* 697 F.Supp. 1464 (N.D.Ill.1988). In *Chicago Newspaper,* the court determined that conditions on a newsrack permit relating to the placement of a newsrack, afforded the defendant city discretion because they allowed for subjective determinations.[6] *Chicago Newspaper,* 697 F.Supp. at 1467–68, *citing, Shuttlesworth,* 394 U.S. at 150–51, 89 S.Ct. 935 (law must provide "narrow objective and definite standards to guide the licensing authority") and *Swearson v. Meyers,* 455 F.Supp. 88, 91 (D.Kan.1978) (permit system must "leave no factors to be assessed, judgments to be made, or discretion to be exercised.... [T]he decision to grant or deny the license application must be virtually a ministerial one.").

NVP also cites *Foti v. City of Menlo Park, supra.* In *Foti,* the Ninth Circuit found that an ordinance restricting signs in the public right-of-way, but with an exception for signs on vehicles that are not parked to attract attention to be invalid. *Foti,* 146 F.3d at 639. The court found that the ordinance's provisions requiring the municipality to determine the subjec-

tive intent of the individual placing the sign on a vehicle by examining, *inter alia,* the choice of parking space, the flow of pedestrian traffic around said space, and the size, color, shape, etc., of the sign, were "so imprecise that discriminatory enforcement [was] a real possibility." *Id.* (internal quotation omitted). The court stated that "an even greater degree of specificity and clarity" must be present when First Amendment freedoms are at stake. *Id.* at 638.

In response, the City argues only that NVP does not allege that its publications have been denied permits under these provisions. The City does not cite any authority addressing the merits of NVP's contention that the criteria under § 12.34.050 are too broad to satisfy the First Amendment.

 The City is correct in stating the NVP was not denied a permit under the Ordinance. While this may inform the question of irreparable injury and the balance of hardships, it does not negate NVP's standing to assert a facial challenge or the merits of its claim. As discussed above, where a regulation poses an inherent risk of censoring First Amendment rights, because of its grant of excessive discretion, the regulation is subject to a facial attack regardless of whether the plaintiff has or has not applied for a permit. *City of Lakewood,* 486 U.S. at 759–61, 108 S.Ct. 2138. Even where a periodic permit has been granted, there remains

---

6. In *Chicago Newspaper,* the defendant city's ordinance provided in pertinent part that: "Newspaper dispensing devices shall be placed adjacent and parallel to building walls not more than six inches (6″) distant therefrom or near and parallel to the curb not less than eighteen inches (18″) and not more than twenty-four inches (24″) distant from the curb at such locations applied for and determined by the city manager not to cause a health or safety hazard or interfere with the right of the public to use of the streets, throughfares, and

sidewalks." *Chicago Newspaper,* 697 F.Supp. at 1467. The ordinance also provided that: "No newspaper dispensing device shall be placed, installed, located, used, or maintained: (e) Within five hundred feet (500′) of another newspaper dispensing device, except that the city manager may permit three (3) such dispensing devices at an intersection where such placement would not impair traffic or otherwise create a hazardous condition." *Id.*

both the risk of future denials on impermissible grounds as well as the risk of self-censorship.

■ On the merits, it would appear that the conditions enumerated in Calistoga Municipal Code § 12.34.050 are similar to those found to be exceedingly discretionary in *Chicago Newspaper, supra.* The ordinance in *Chicago Newspaper* allowed the municipality to deny a permit where the newsrack was determined to be a "health or safety hazard or interfere[d] with the right of the public to use of the streets, throughfares, and sidewalks." *Chicago Newspaper*, 697 F.Supp. at 1467. Here, "the City may deny a newsrack permit where it determines that the newsrack endangers the safety of persons or property," Calistoga Muni.Code § 12.34.050(B)(1), or "unreasonably interferes with or impedes the flow of pedestrian or vehicular traffic." Calistoga Muni. Code. § 12.34.050(B)(3). This criteria seems particularly problematic since by their very nature, newsracks impede traffic. Newsracks are most effective in locations where pedestrian traffic is heaviest. Additionally, as in *Foti, supra,* the conditions to be enforced by the City arguably are imprecise enough to permit discriminatory enforcement.

On the other hand, the Court notes that *Chicago Newspaper* was decided before *Ward v. Rock Against Racism*, 491 U.S. 781, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989). Significantly, in *Ward*, the Supreme Court noted that "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity," and thus conferral of discretion on officials does not render a regulation invalid *per se* under the First Amendment. *Ward*, 491 U.S. at 794, 109 S.Ct. 2746. Moreover, the Ninth Circuit has upheld fair broad interpretive regulations which conferred substantial judgment in officials of the United States Forest Service in *United States v. Linick, supra. Linick*, 195 F.3d at 542–43.

Given the scant authority provided to the Court, it appears that NVP has not demonstrated a likelihood of success on its claim that §§ 12.34.050(B)(1) and (B)(3) of the Ordinance are unconstitutional. At best, it has presented serious questions on the merits.

### ii. Encroachment permit

■ Calistoga Municipal Code § 12.34.040, specifically subsection (A), also requires a person obtain an encroachment permit pursuant to § 12.08.020, prior to installing or placing a newsrack on any public sidewalk or parkway.

Section 12.08.020(G) states in pertinent part that "[u]pon compliance by the applicant with the conditions and requirements specified in this section, the [City] may in the [City's] discretion issue a written permit to the applicant to do and perform the acts mentioned in the permit."

On its face, there are no limits on the City's discretion to grant or deny an encroachment permit. As such, this provision of the Ordinance is akin to the kind of discretion found unconstitutional in *City of Lakewood, supra,* and *Foti, supra. See Linick*, 195 F.3d at 541–42 (regulation which permits Forest Service to impose terms and condition on use permit as officer "deems necessary to . . . otherwise protect the public interest," conferred "unbridled discretion" and was facially overbroad absent narrowing interpretative regulation).

At the August 21, 2002 hearing, the City indicated that § 12.08.020 is applied by the City only after a newsrack permit has been awarded and the terms of an encroachment permit exist only to inform the newsrack permit recipient as to the standards of newsrack installation and locations. The City argues that the encroachment permit requirement is not a "real

requirement" and does not allow the City any discretion to actually prohibit the installation of a newsrack for which a person has previously obtained a newsrack permit.

Notwithstanding the City's argument at the hearing, the fact remains that on its face the Ordinance requires the second, encroachment permit. While the Court should consider an agency's narrowing interpretation of a facially overbroad regulation, *see Ward*, 491 U.S. at 795, 109 S.Ct. 2746; *Linick*, 195 F.3d at 542, the City's proffered interpretation here has not been formally embodied in any official document. It is asserted solely by argument of counsel. More importantly it is not consistent with the plain language of the Ordinance. The Court is "not required to insert missing terms into the statute or adopt an interpretation precluded by the plain language of the ordinance." *Foti*, 146 F.3d at 639. This is particularly true where First Amendment concerns are heightened in the context of discretion in reviewing periodic renewals of permits which threaten lawful expressive activity. *United States v. Griefen*, 200 F.3d 1256, 1264 (9th Cir.), *cert. denied*, 530 U.S. 1234, 120 S.Ct. 2670, 147 L.Ed.2d 282 (2000).

At this juncture, the Court concludes that NVP has demonstrated a likelihood of success on its claim that the Ordinance's requirement of an encroachment permit (Calistoga Muni.Code § 12.34.040(A)), which provides the City unbridled discretion in denying such a permit, is facially unconstitutional.

#### b. The possibility of irreparable harm and the balance of hardships

Despite the fact that NVP has not been denied a newsrack or encroachment permit

in the exercise of discretion under the subject provisions of the Ordinance, the possibility of irreparable harm is present here. As discussed above, the risk of future censorship by the licensing authority and self-censorship by the publisher inheres in a discretionary scheme. *See City of Lakewood*, 486 U.S. at 758, 108 S.Ct. 2138; *Outdoor Systems*, 997 F.2d at 613. For the same reasons why a facial challenge to a ordinance affecting First Amendment freedoms is permitted, "the possibility of irreparable harm" presumptively obtains for purposes of preliminary injunctive relief.

However, because NVP has not been denied an encroachment permit or newsrack permit in the exercise of the City's discretion, nor has it shown such action is likely to occur during the pendency of this suit, NVP has not demonstrated that the balance of hardships tips sharply in its favor.

Because NVP has demonstrated a likelihood of success on the merits and the possibility of irreparable injury with respect to the encroachment permit only, a preliminary injunction is warranted to enjoin Calistoga Municipal Code § 12.34.040(A), but not § 12.34.050.

### 3. The numerical limits on newsracks and the lottery

#### a. Merits

 In addition to challenging the City's discretion in the issuance of newsrack and encroachment permits, NVP challenges the constitutionality of the limits on the number of newsracks permitted by the Ordinance[7] and the system of allo-

---

7. Section 12.34.050(C)(1) provides in pertinent part that apart from exceptions at three locations: "No more than eight racks con-

tained in a modular newsrack shall be located in any public right-of-way within the same block." Twelve newsracks are permitted: on

cating annual permits by lottery where the number of publications exceeds the maximum number of newsracks permitted at any particular location.[8] The issue is whether this aspect of the Ordinance in restricting the number of newsracks is a valid time, place and manner regulating of speech.

■ A municipality may impose reasonable restrictions on the time, place or manner of engaging in protected speech. *Ward*, 491 U.S. at 791, 109 S.Ct. 2746. To qualify as a time, place, manner restriction on expression, the restriction must be neutral in content, narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication. *See Honolulu Weekly, Inc. v. Harris*, 298 F.3d 1037, 1043–44 (9th Cir. 2002) (quotations omitted); *Foti*, 146 F.3d at 635.

### i. Content neutral

A municipality's restriction on the number of newsracks allowed within city limits may be permissible as a time, place and manner restriction where the restriction applies equally to all publications, irrespective of a publication's content. *See Honolulu Weekly*, 298 F.3d at 1043–44 ("speech restrictions are content-neutral when they can be justified without reference to the content of the regulated speech" (internal quotations omitted)). "A law that 'confers benefits or imposes burdens on speech without reference to the ideas or views expressed' is normally content-neutral." *Id., quoting, Turner Broad. Sys. v. Federal Communications Commission*, 512 U.S.

622, 642–43, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994).

On its face, the Ordinance is content-neutral as it does not limit the location or number of newsracks based on publication type or content. In fact, the use of a random lottery to determine which publications will receive the available newsrack space where demand exceeds the number of permissible racks is one method of safeguarding against content discrimination. It leaves no discretion or judgment in the hands of administrators as to selection of publications; instead allocation is left to chance. While NVP attacks the lottery as arbitrary, it would appear that random arbitrariness is a virtue rather than a vice, at least with respect to the interest in insuring content neutrality.

NVP contends that the lottery provision may have been enacted as a means of discriminating against NVP and its publications by providing more favorable treatment to other "hometown" publications (the *Calistoga Tribune* and the *Calistoga Weekly*, distributed by local publishers) than would have been afforded under the initial draft of the Ordinance. In particular, NVP alleges that an initial draft of the Ordinance would have given priority to its daily newspaper over the other newspapers because it would have prioritized entitlements based upon frequency of publication. NVP suggests the Ordinance was amended to include a lottery system as presently constituted in order to eliminate the advantage NVP would have had over the local publications. But the fact that

---

the east and west sides of Lincoln Avenue between Washington Street and Cedar Street; on the sidewalk in front of 1458 Lincoln Street; and in front of the United States Post Office at 1013 Washington Street. Calistoga Muni.Code §§ 12.34.050(C)(1)(a)-(c).

**8.** Section 12.34.040(E) provides in pertinent part that where sufficient space does not exist

to accommodate all applications for newsracks pursuant to § 12.34.050(C)(1), the City shall "assign the locations by placing into a container the names of the publications competing for one location. Names shall be drawn from the container, one at a time, until the number of locations has been assigned."

the initial draft of the Ordinance would have clearly advantaged NVP tends to negate any claim that the Ordinance, which had been discussed for months, was initiated with the purpose of discriminating against out-of-town publications. While the Ordinance was eventually amended to include the lottery, as pointed out above, the lottery is one neutral approach to allocating permits. Eliminating a preference does not necessarily imply an intent to discriminate. In any event, other than the evolution of the Ordinance, NVP points to nothing suggesting the City's intent to discriminate against out-of-town publishers. Indeed, NVP and other out-of-town publishers were included in the initial discussions with the City that led to the in formulation of the Ordinance. Accordingly, absent substantial evidence of discriminatory intent, the Court need not reach the question whether discrimination against out-of-town publishers (without evidence of discrimination based on the content of publications) would constitute a content-based regulation.

NVP also contends that the Ordinance has been applied in a way that favors local publications. For instance, NVP alleges that the number of newsracks at the Post Office location was amended to allow for sixteen racks as opposed to twelve, thus making room for the *Calistoga Tribune* and the *Calistoga Weekly* which otherwise would be denied newsrack space. However, the evidence in the record indicates that the number of newsracks permitted at the Post Office location was increased, because the modular newsracks at that location abut a wall and thus do not interfere with the City's interests of preserving store front visibility. It would appear that this location had unique attributes.

NVP also contends that the *Napa Sentinel*, another publication, was permitted to utilize a non-conforming newsrack for some period of time. August 16, 2002

Decl. of Ron Jacaban, ¶ 7, Ex. A. But NVP provides no evidence that this problem was brought to the attention of City officials responsible for enforcement of the Ordinance, and if so, what they did in response.

In any event, these "as-applied" complaints do not render the Ordinance facially unconstitutional as a content-based restriction on speech. The Court is satisfied at this juncture that the Ordinance should be analyzed as a content-neutral time, place and manner restriction.

### ii. Narrowly tailored to serve a substantial government interest

A time, place and manner restriction is narrowly tailored, "so long as the regulation promotes a substantial government interest that would be achieved less effectively absent the regulation and the regulation is not substantially broader than necessary to achieve the government's interest." *Honolulu Weekly*, 298 F.3d at 1045 (internal quotations omitted).

NVP contends that the Ordinance is not narrowly tailored to serve a substantial government interest because: (1) there is insufficient evidence showing that newsracks created a problem warranting regulation; and (2) the numerical limits and the lottery at issue are not sufficiently narrow.

### (a) Substantial government interest

City governments have " 'a substantial interest in protecting the aesthetic appearance of their communities by avoiding visual clutter and in assuring safe and convenient circulation on their streets,' " *Foti*, 146 F.3d at 637, *quoting, One World One Family Now v. City and County of Honolulu*, 76 F.3d 1009, 1013 (9th Cir.) (internal quotations omitted), *cert. denied*, 519 U.S. 1009, 117 S.Ct. 554, 136 L.Ed.2d 403 (1996), and in protecting the health and

welfare of its citizens. *Honolulu Weekly*, 298 F.3d at 1045 ("The government has a substantial interest in protecting the health and welfare of its citizens. Additionally, both the Supreme Court and this Court have found that aesthetics can be a substantial government interest." (Citations omitted)).

In First Amendment cases, substantial government interests are "determined by objective indicators as taken from the face of the statute, the effect of the statute, comparison to prior law, facts surrounding the enactment of the statute, the stated purpose and the record of the proceedings." *City of Las Vegas v. Foley,* 747 F.2d 1294, 1297 (9th Cir.1984).

Here, the City declared that it enacted the Ordinance to address health, safety, welfare and aesthetic issues. The introduction to the Ordinance summarizes the City's asserted interests:

"[T]he City [ ] finds and declares that the uncontrolled placement and maintenance of newsracks in the public right-of-way can constitute a threat to public health, safety, and welfare by interfering with and obstructing the use of the public right-of-way and by offending community aesthetic sensibilities.... [T]he City [ ] recognizes, however, that the use of such rights-of-way is so historically associated with the sale and distribution of newspapers and new periodicals that access to those areas for such purposes should not be absolutely denied.... [T]he City further finds that the strong and competing interests of providing for newsracks as a means to distribute information that is accessible to the public, and in a manner that is sensitive to aesthetic attributes and pedestrian circulation requires a reasonable accommodation which can only be satisfactorily achieved through the means of this Chapter, which is designed to accommodate such interests by regulating the time, place and manner of using such newsracks."

Calistoga Muni.Code § 12.34.050, Section One. Additionally, the Ordinance specifically goes on to state its purpose:

The purpose of the Chapter is to promote the public health, safety, and welfare through the regulation of placement, appearance, number, size, and servicing of newsracks on the public rights-of-way so as to:

1. Protect the right to distribute information, protected by the United States and California Constitutions, through the use of newsracks.

2. Provide for pedestrian and driving safety and convenience.

3. Ensure no unreasonable interference with the flow of pedestrian or vehicular traffic, including but not limited to, ingress into, or egress from any place of business or residence, from the street to the sidewalk, or from parked vehicles to the sidewalk.

4. Provide reasonable access for the use and maintenance of sidewalks, poles, posts, traffic signs and signals, hydrants, mailboxes, and similar appurtenances, and access to locations used for public transportation purposes.

5. Reduce visual blight on the public rights-of-way, encourage well-designed and aesthetically compatible newsracks and protect the aesthetics and value of surrounding properties.

6. Reduce exposure of the City to personal injury or property damage claims and litigation.

Calistoga Muni. Code § 12.34.010.

Furthermore, the record contains evidence that prior to the Ordinance's enactment, individual newsracks in the City of Calistoga had become a problem. There is evidence that some merchants considered newsracks to be a blight and detrimental

to their business and exercised self-help. *See* August 7, 2002 Decl. of Wayne Salk,[9] ¶ 24; August 7, 2002 Decl. of Ron Jacaban,[10] ¶ 11. Public hearings were held at which citizens voiced their concerns over problems with newsrack design, location, numerosity. August 14, 2002 Decl. of Richard Tooker,[11] ¶ 5, Ex. B and C. Therein, the City discussed consolidating newsracks to avoid a multitude of colors and sizes that distracted from Calistoga's "unique environment." *Id.* at ¶ 5, Ex. D. Other meetings were held at which the importance of preserving the City's downtown environment and the City's desire to have newsracks set back from curbs for public safety and economic reasons was discussed. *See id.* at ¶ 5, Ex. B–E. In considering the Ordinance, the City's Planning Commission took a tour of the downtown area to examine existing individual newsracks and planned locations post enactment. *Id.* at ¶ 5, Ex. C and D.

NVP contends that before the City can regulate newsracks, evidence must exist in the record showing that the activity at issue—newsracks—created a "special problem" warranting regulation. NVP cites in support *Watchtower Bible & Tract Society of New York, Inc. v. Village of Stratton,* 536 U.S. 150, 122 S.Ct. 2080, 2091, 153 L.Ed.2d 205 (2002). But *Watchtower Bible* does not hold that a city must factually prove the existence of a "special problem" before enacting a time, place and manner regulation. The Court in *Watchtower Bible* did not analyze the broad and intrusive regulation of door-to-door canvassing under a traditional time, place and manner analysis. Because the regulation covered "so much speech" affecting not only First Amendment interests, but "the very notion of a free society," the Court appears to have subjected the regulation to heightened scrutiny. *Watchtower Bible,* 122 S.Ct. at 2089. Moreover, in evaluating the city's justification of the regulation, the Court noted the City had not asserted an interest in crime prevention and that there was no evidence of a "special crime problem" from which such justification could be imputed. *Id.,* 122 S.Ct. at 2091. *Watchtower Bible* is inapposite to a newsrack regulation which is subject to a time, place and manner analysis and for which the city has asserted specific interest in support thereof.

Importantly, nearly all cases addressing the issue have found newsracks to affect both aesthetics and public safety without specific evidence of any "special problem." In *Honolulu Weekly, supra,* the court noted that the defendant city believed that having rows of individual newsracks along the streets of the city of Waikiki constituted visual clutter and detracted from the city's aesthetics and had concern for the public's safety as the streets and sidewalks of the tourist-laden city had become rather congested. The *Honolulu Weekly* court found that substantial government interests in aesthetics and safety existed without mentioning or requiring any specific evidence as to the existence of those interests other than the city's indication that it "believed that having rows of disparate newsracks strewn up and down Waikiki's streets constituted visual clutter." *Honolulu Weekly,* 298 F.3d at 1045. *See Chicago Observer, Inc. v. City of Chicago,* 929 F.2d 325, 328 (7th Cir.1991) (upholding limita-

---

9. Wayne Salk is the Distribution Manager of California Circulation Services which distributes two publications in the City, *Homes & Land of the North Bay* and *Bay Area Golf Guide.* August 7, 2002 Decl. of Wayne Salk, ¶¶ 1–2.

10. Ron Jacaban is the Single Copy Manager for NVP. August 7, 2002 Decl. of Ron Jacaban, ¶ 1.

11. Richard Tooker is the Director of the City's Department of Planning and Building. August 14, 2002 Decl. of Richard Tooker, ¶ 2.

tions on the size of newsracks and off-premises advertisements on newsracks as "[c]ities may curtail visual clutter, for aesthetic and safety reasons"); *Jacobsen v. Harris,* 869 F.2d 1172, 1174 (8th Cir.1989) (upholding permit and insurance requirements as well as restrictions on the size, type, and location of newsracks).

While it is true that the "inherent subjectivity of aesthetic judgments makes it all too easy for the government to fashion its justification," *Foti,* 146 F.3d at 637 (citation omitted), it appears that the Courts have nonetheless given particular deference to municipalities in aesthetic matters. *See Members of the City Council of City of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 807, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984); *Metromedia, Inc. v. City of San Diego,* 453 U.S. 490, 512, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981). To be sure, the Court must scrutinize interests to ensure restrictions were not enacted under pretext for other illegitimate motives, but in this case, there is no indication in the record thus far that the City's interests are not genuine. As noted above, there is evidence in the record which demonstrates that the Ordinance was enacted in response to a perceived problem with the proliferation of unregulated newsracks.

However, deference to the government's assertion of a substantial interest, so long as it is not demonstratively pre-textual, does not end the Court's inquiry. The reasonableness of the means selected to further those interests may be subject to closer scrutiny. Often, "the outcome turns not on whether the specified interests are significant, but rather on whether the regulation is narrowly tailored to serve those interests." *Gold Coast Publications, Inc. v. Corrigan,* 42 F.3d 1336, 1345 (11th Cir. 1994), *cert. denied,* 516 U.S. 931, 116 S.Ct. 337, 133 L.Ed.2d 236 (1995). *See Honolulu Weekly,* 298 F.3d at 1045.

### (b) Narrowly tailored

Under a time, place and manner analysis, a regulation is "narrowly tailored" where the " 'regulation promotes a substantial government interest that would be achieved less effectively absent the regulation' and the regulation is not 'substantially broader than necessary to achieve the government's interest.' " *Honolulu Weekly,* 298 F.3d at 1045, *quoting, Ward,* 491 U.S. at 799–800, 109 S.Ct. 2746.

The first prong appears satisfied here. The City's interests in public safety and aesthetics are promoted more effectively by the Ordinance's restrictions on newsracks as opposed what would otherwise be achieved without the Ordinance. Neither party appears to dispute this fact.

The second prong, however, is problematic. What the City must show in justifying the breadth of a regulation is not clear from the case law. The Ninth Circuit has held in some time, place and manner cases that "the First Amendment demands that municipalities provide 'tangible evidence' that speech-restrictive regulations are 'necessary' to advance the proffered interest in public safety." *Edwards v. City of Coeur d'Alene,* 262 F.3d 856, 863 (9th Cir.2001), *quoting, Bay Area Peace Navy v. United States,* 914 F.2d 1224, 1227 (9th Cir.1990) (*"Peace Navy"*).

In *Edwards,* the Court held that the lack of empirical evidence supporting the need to ban picket sign supports to prevent violence rendered the ban unconstitutional. *Edwards,* 262 F.3d at 864–65. In *Peace Navy, supra,* the court found there was no "tangible evidence" that a 75–yard security zone around a pier containing dignitaries watching a parade of naval ships was necessary to protect those officials. *Peace Navy,* 914 F.2d at 1227. Noting there was no evidence why a 25–yard zone was insufficient, the court found the 75–yard zone was "substantially broader than

necessary to advance the government's purpose." *Id.* at 1228.

On the other hand, the court in *Honolulu Weekly, supra,* did not appear to demand "tangible evidence" justifying the scope of the newsrack regulation at issue. The court simply noted that the "content-neutral scheme balances various need and goals." *Honolulu Weekly,* 298 F.3d at 1045. Moreover, there is language in *Foti, supra,* which suggests that so long as the means chosen is a "reasonable legislative judgment," its breadth may be upheld. *Foti,* 146 F.3d at 641. Yet, in another part of the opinion addressing a different provision, *Foti* holds that "the record before us does not establish a reasonable fit between the city's means and ends." *Foti,* 146 F.3d at 642. The case law is difficult to conciliate. It may be that the amount of "tangible evidence" required to justify the breadth of a regulation may vary with the degree of impingement on speech entailed. *See Edwards,* 262 F.3d at 865 ("The lack of empirical evidence supporting the ordinance's sign support ban would be less problematic if the impact on speech were negligible.").

If *Peace Navy, supra,* and *Edwards, supra,* were controlling here, the Court would have to examine the evidence justifying the Ordinance's restriction which limits NVP's speech-in particular the restrictions on the number of newsracks permitted per location.

In this regard, there appears to be no "tangible evidence" justifying the Ordinance's particular limit on the number of newsracks per block. The City has produced no evidence which explains how the limit was arrived at. Not only is there a lack of tangible evidence supporting this limitation, it appears that an early staff report suggested that the City consider whether it would allow two modulars cabinets of six newsracks (twelve instead of eight racks) each on one block in order to accommodate more publishers. August 7, 2002 Decl. of Gregory Jung, ¶ 2, Ex. 1. Moreover, the Ordinance contains numerous exceptions to the limit of eight, permitting as previously noted twelve and sixteen newsracks in some locations. This casts further doubt on the propriety of the numerical limit set forth in the Ordinance. Furthermore, NVP submitted copies of ordinances from other cities (of which the Court takes judicial notice under Federal Rule of Evidence 201) which set higher or no numerical limits. *See* August 7, 2002 Decl. of Gregory Jung, ¶¶ 5 and 6, Ex. 4 and 5 (the cities of St. Helena, Pasadena, Santa Monica, Santa Cruz, Mill Valley, Palo Alto, Orinda and San Luis Obispo, California). Finally, the Court notes that the comprehensiveness of other provisions of the Ordinance regulating the size, color, configuration and location of the modular racks, *see* Calistoga Muni.Code § 12.34.050 (Standard for the Installation, Maintenance and Operation of Newsracks), would appear to go a long way in addressing the City's concern about aesthetics, pedestrian circulation and safety. In short, it is not clear why the number of newsracks could not be expanded to accommodate more, if not all publications, without jeopardizing the City's asserted interests.

Although the existence of possible less restrictive alternatives to the Ordinance is not dispositive of whether the Ordinance is "narrowly tailored," *see Honolulu Weekly,* 298 F.3d at 1046, where there are "numerous and obvious less-burdensome alternatives to the restriction on protected speech, that is certainly a relevant consideration in determining whether the 'fit' between ends and means is reasonable." *Edwards,* 262 F.3d at 865, *quoting, City of Cincinnati v. Discovery Network, Inc.,* 507 U.S. 410, 418 n. 13, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993). *See Honolulu Weekly,* 298 F.3d at 1046 ("[P]ointing out the alternatives available does not necessarily mean

advocating the rejected least restrictive test.").

The Court acknowledges the apparent ambiguity in the legal standard that applies, as well as the fact that particularly in the area of aesthetics, it is difficult to defend any particular line drawn with "tangible evidence." Nonetheless, in light of *Peace Navy* and *Edwards*, the Court finds at this juncture there is at least a serious question presented as to whether the Ordinance is sufficiently narrowly tailored and not substantially broader than necessary to achieve the City's asserted interests.

### iii. Alternative channels of communication

While the Court thus need not address alternative available channels of communication, the Court notes that *Honolulu Weekly, supra,* appears to afford substantial deference to the government. In *Honolulu Weekly,* the Ninth Circuit found ample alternative channels of communication, because a newspaper publisher, removed from its preferred coin-operated newsracks, still had the opportunity to distribute using non coin-operated newsracks and other distribution mechanisms within and outside of the regulated area. *Honolulu Weekly,* 298 F.3d at 1047. The fact that the publisher believed losing certain newsracks would hurt its ability to compete with other publications and that the number of non coin-operated racks to which the publisher was relegated was insufficient did not prevent the Court from finding the alternatives ample. *See id.* at 1046.

Here, were a preliminary injunction denied, NVP would be forced out of five newsrack locations around the City. Because NVP would nonetheless be able to distribute its publications through newsracks it had "won" in locations other than the five it "lost" as well as possibly other locations, NVP would not be completely barred from reaching its intended audience. *See Outdoor Systems,* 997 F.2d at 612 (holding that alternative channels are available where the channel at issue remains available albeit in a regulated form); *Peace Navy,* 914 F.2d at 1229 (determining that ample alternative channels were not available where 75–yard zone did not allow the plaintiff to reach its intended audience). *Cf. Chicago Newspaper,* 697 F.Supp. at 1470 (finding no ample alternative channels for publication where newsracks were subject to complete ban). The fact that it may lose some readership (as was apparent in *Honolulu Weekly* ) would not necessarily, in and of itself, demonstrate that ample alternative channels of communication do not exist. Ultimately, it may be question of degree. If NVP were barred from reaching a substantial portion of its readership, notwithstanding use of alternative locations, it may be able to prove those alternatives are not "ample." In this regard, the Court reiterates that the *City* has the burden of proof that each element of the time, place and manner test is met, including the availability of ample alternatives. The Court also notes that the mere tender of alternative locations without some showing of their effectiveness, particularly in view of the fact that apparently no other publications have deemed these alternatives worthy of distributing their publications, may not suffice to carry that burden.

In any event, the Court need not reach the question whether this prong of the test raises a serious question on the merits since NVP has raised a serious question whether the Ordinance burdens substantially more speech than necessary to achieve its stated goals.[12]

---

**12.** Because the Court determines that a serious question as to the validity of the Ordinance's numerical limitations on newsrack exists, the Court need not make any determination as to the validity of the Ordinance's

### b. Balance of hardships

 With respect to the limit on newsrack space and the lottery, the balance of hardships tip sharply in favor of NVP. Were the preliminary injunction denied, the City will be able to enforce the results of its April 17, 2002 lottery, resulting in NVP's loss of its ability to distribute its publications from newsracks from five locations in the city of Calistoga, including its prime location at The Depot, a popular tourist destination (which accounted for thirty percent last year's sales for *The Napa Valley Register*). On the other hand, were a preliminary injunction granted and the status quo maintained, NVP will continue to distribute its publications from its current newsrack locations within the City, and avoid any interim loss of its opportunity to distribute its publication.

The City asserts that if a preliminary injunction were granted, those publications awaiting space in newsracks who "won" spaces in the five locations where NVP "lost," will be prejudiced and their First Amendment rights will be impinged. However, NVP has proposed to pay for and install an additional modular rack at each of the five locations at issue to accommodate these third parties. NVP states it has contacted the affected third parties who assented to this proposal. As such, the third party concerns raised by the City

are alleviated. The only hardship then would be that claimed by the City. But the City's hardship is neither clear nor substantiated by the record. The City presents no evidence how the placement of one additional newsrack in each of the five locations will substantially impair the City's interests in aesthetics and public safety. At this point, the City has only represented that it will be harmed in its failed ability to enforce the Ordinance. While the Court recognizes the City's valid interest in being able to enforce its laws, given the First Amendment rights at stake here, the material injury NVP would suffer, and the minor deviation from the Ordinance which would ensue from the preliminary injunction, the balance of hardships tips sharply in favor of NVP.

### 4. The public interest

Here, the public interest weighs in favor of the issuance of a preliminary injunction to maintain the status quo and to protect First Amendment rights, not only of NVP but of other publications as well.

Courts have consistently recognized the public interest in safeguarding First Amendment rights. *See Sammartano*, 303 F.3d at 974–75, citing, *Homans v. Albuquerque*, 264 F.3d 1240, 1244 (10th Cir. 2001) ("[W]e believe that the public interest is better served by following binding

annual lottery. However, as discussed above, the Court notes that although NVP contends lottery requirement to be arbitrary, the lottery requirement appears to be one neutral means to distribute the scare resource of newsrack space where demand exceeds supply. There may be others (such as prioritizing by frequency of publication or tenure). NVP also contends that the annual permit and yearly lottery does not allow for planning and creates a financial hardship. NVP would seem to prefer a one-time permitting system with losers and newcomers to be placed on a wait list. NVP also points to the lottery held every three years in the City of Honolulu, in *Honolulu Weekly, supra,* as a possibly more viable

alternative. However, as with any election or lottery there inevitably are winners and losers. The time spent as a winner is never long enough and the time spent as a loser is always too short. Permitting a more frequent lottery would help open opportunities for new publications and encourage entrants into the marketplace. That value must be balanced against the possible lack of predictability needed by publications. The Court expresses no views on the merits of these matters at this early stage save to note *Honolulu Weekly's* admonition that the Court will not scrutinize a city's choice for the best possible alternative.

Supreme Court precedent and protecting the core First Amendment right of political expression.") and *Iowa Right to Life Committee, Inc. v. Williams,* 187 F.3d 963, 970 (8th Cir.1999) (finding a district court did not abuse its discretion in granting a preliminary injunction because "the potential harm to independent expression and certainty in public discussion of issues is great and the public interest favors protecting core First Amendment freedoms" (citations omitted)); *Monterey County Democratic Central Committee v. United States Postal Service,* 812 F.2d 1194, 1196 (9th Cir.1987) ("The values embodied in the First Amendment ... constitut[e] the hallmark of free societies."). "The public's interest in safeguarding the fundamental rights of the First Amendment outweighs any competing public interest in the maintenance of the public walkways." *One World One Family Now, Inc. v. State of Nevada,* 860 F.Supp. 1457, 1464 (D.Nev. 1994) (internal citation omitted). As previously noted, "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod,* 427 U.S. at 373, 96 S.Ct. 2673.

### *ORDER*

The Court **GRANTS IN PART AND DENIES IN PART** NVP's motion for a preliminary injunction (Docket No. 11). The Court finds that as to the encroachment permit requirement (Calistoga Muni. Code § 12.34.040(A)), NVP has shown that it is likely to succeed on the merits as to its facial challenge to the constitutionality of this provision as it is presently constituted. NVP has also demonstrated that the possibility of irreparable injury exists were the preliminary injunction denied as to this provision.

The Court finds that as to the newsrack permit requirement (Calistoga Muni.Code § 12.34.040(B)), NVP has shown only a serious question as to the merits as to the

facial constitutionality of this provision. The Court determines that the balance of hardship does not tip sharply in favor of NVP as to this provision. Preliminary injunctive relief is not warranted as to the newsrack permit requirement.

The Court finds that NVP has shown that a serious question exists as to the constitutionality of the numerical restrictions (and therefore the annual lottery) imposed by the Ordinance. The balance of hardships tips sharply in favor of NVP, thus warranting a preliminary injunction as to this provision.

Accordingly, the City is hereby restrained and enjoined from enforcing § 12.34.040(A) (encroachment permit requirement), § 12.34.050(C) (numerical limit), and § 12.34.040(E) (lottery) of Title 12 of the Calistoga Municipal Code, as to NVP and its publications. This injunction shall enjoin enforcement of the results of the lottery held thereto on April 17, 2002, as amended April 26, 2002 (as to NVP and its publications only), the Notices of Violation of NVP, dated June 17, 2002, and July 31, 2002 Notice of Violation Appeal and order to remove newsracks from: Bank of the West, Café Sarafornia, Calistoga Inn, The Depot and Nance's.

As a condition of the preliminary injunction, NVP shall install as soon as practicable additional newsracks to accommodate the interests of third-party publications. The City shall permit the installation, by and at the cost of NVP, of one additional newsrack each at the following locations: Bank of the West, Café Sarafornia, Calistoga Inn, The Depot, and Nance's. These additional newsracks shall be occupied by those publications which "won" newsrack space in the April 17, 2002 lottery and which have not been able to distribute their publications from those newsracks due to NVP's occupancy. These five additional newsracks shall comply with all oth-

er provisions of the Ordinance not enjoined by this Order (including color, size, etc.) where practicable.

The Court determines that given the minimal risk of harm to the City resulting from the preliminary injunction, the bond previously posted by NVP, in the amount of $5,000.00, shall remain in place as sufficient security therefor.

IT IS SO ORDERED.